SUWANNEE LUMBER MANUFACTURING COMPANY, INCORPORATED, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Suwannee Lumber Mfg. Co. v. Commissioner
Docket No. 2912-76.
United States Tax Court
T.C. Memo 1979-477; 1979 Tax Ct. Memo LEXIS 51; 39 T.C.M. (CCH) 572; T.C.M. (RIA) 79477; November 29, 1979, Filed *51 Held, petitioner was availed of for the purpose of avoiding income tax with respect to its shareholders. Held, further, amounts paid to certain officers of petitioner did not constitute unreasonable compensation for services. Kenneth G. Anderson and Ronald D. Fairchild, for the petitioner. Gerald W. Hartley, for the respondent. IRWIN
MEMORANDUM FINDINGS OF FACT AND OPINION IRWIN, Judge: Respondent determined deficiencies and accumulated earnings tax pursuant to section 531 [1] as follows: Taxable Year Ended
Deficiency
Sec. 531 Tax
6-30-72
$11,040
$ 36,342
6-30-73
16,560
174,205
6-30-74
16,560
86,871 Due to concessions, the issues remaining for our decision are: (1) Whether petitioner is liable for accumulated earnings tax; [2] *52 (2) Whether all or part of the compensation paid by petitioner to M. J. Foley and J. B. Faircloth constituted unreasonable compensation; and (3) Whether, if petitioner is the prevailing party herein, a reasonable allowance for attorneys' fees should be granted. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts together with the exhibits attached thereto are incorporated herein by this reference. Petitioner, Suwannee Lumber Manufacturing Company, Inc., (hereafter Suwannee), was incorporated on December 23, 1954, under the laws of the State of Florida. At all times relevant hereto, including the date on which its petition herein was filed, petitioner's principal place of business was Cross City, Florida. Petitioner timely filed its Federal income tax returns, using the accrual method of accounting for the fiscal years in issue, with the Internal Revenue Service at Chamblee, Georgia. Since incorporation, Suwannee has been primarily engaged in the manufacture and sale of pine and cypress lumber and the sale of chips, bark, and other related by-products from its lumber manufacturing. Suwannee's primary product is finished lumber, *53 most often used in Florida home building and apartment construction. Mill Site
Suwannee's sawmill and administrative offices were located at Shamrock, Florida, an unincorporated area adjacent to Cross City in Dixie County. The mill consisted of two sawmilling operations, a wood preserving plant, one finishing or planing plant, a drying yard and a chipmill, and other improvements to the leased land. Suwannee also had a large woodyard used to store inventory of logs and to air-dry and store manufactured lumber. On December 5, 1967, a major fire destroyed the chipmill and caused substantial damages to other facilities, forcing the mill to close for about three months. Suwannee's insurance covered 80 percent of the damages but Suwannee maintained no business interruption insurance. Suwannee rebuilt the damaged properties and continued its operations at Shamrock. Suwannee's plant was no longer competitive with the modern mills constructed by the large paper companies due to its age and outdated equipment, which required higher labor costs. Newer mills of comparable size required an investment of $1,500,000-$2,000,000. In June 1973, Suwannee paid the expenses of 12 of its key employees *54 to attend the Southern Forest Products Association convention in Atlanta so that they could inspect the efficient labor saving machinery on display there. Corporate minutes of June 2, 1973, state that plans should be made to replace Suwannee's machinery with newer and more efficient equipment. The mill was constructed in about 1927 and was located on land leased by Foley Lumber Industries, Inc. (hereafter Foley Lumber) in 1953 for a term of fifteen years from Shamrock Properties, In. (hereinafter Shamrock). Foley Lumber's operation of the sawmill proved unsuccessful and it sold its interests in the lumber mill, its business and equipment, and cutting rights on timberlands in Dixie and Taylor Counties to Suwannee in December 1954, and on January 3, 1955, assigned the lease on the mill site to Suwannee. In 1962, Suwannee and Shamrock amended the lease, confirming the 1955 assignment of the lease to Suwannee by Foley Lumber and setting the expiration date for the lease at June 15, 1978. During 1972, Suwannee became concerned about securing continued use of the mill site after the expiration of its lease with Shamrock. Suwannee talked with Shamrock about the possibility of buying *55 the 85-acre site and an adjoining 900-acre tract of land, but Shamrock was not interested, pre-ferring instead to merely extend the term of the lease. Suwannee then requested that it at least be given a right of first refusal should Shamrock ever decide to sell the site and adjoining tract. On March 1, 1975, Shamrock and Suwannee executed a new lease on the property which extended the expiration date to December 31, 1989, with an option to renew for an additional ten year period. A right of first refusal in favor of Suwannee was contained in the 1975 lease. This gave Suwannee the right to purchase, within thirty days of notice from Shamrock, the leased premises and 900 acres of adjacent timberland owned by Shamrock on the same terms and conditions as that provided under any other purchase agreement Shamrock might obtain. Manufacturing Cycle
Approximately 85 percent of Suwannee's lumber production was air-dried finished pine lumber. The production cycle for mills typical of Suwannee's size commenced when logs were delivered to the "woodyard." The logs remained there until the mill was capable of handling them, but no longer than four weeks (due to the possibility of deterioration) *56 at which time they were debarked. The logs would then be cut into rough lumber, go through a dipping process and then be stacked to be air-dried. Depending on weather conditions, this process required between 30 to 90 days. After the rough lumber was dried, it was placed through the planer mill where it was finished and made ready for shipment. The remaining 15 percent of Suwannee's lumber production was kiln-dried instead of air-dried, a process which required only 10 days once the necessary lumber had been inventoried, but at greatly increased costs. Shareholders and Officers
At the time Suwannee incorporated, its stock was held as follows: George T. Dickert
47.6%
Judson B. Faircloth
47.6%
O'Neal Boatright
4.8%
The original stock was issued at $250 per share, with no par value. In February 1960, M. J. Foley purchased approximately 22 percent of Suwannee's outstanding stock and in 1962, Foley purchased all the shares held by O'Neal Boatright. George T. Dickert, Jr., the son of George T. Dickert (Dickert) became employed by Suwannee in 1970, at which time he was 27. On or about April 28, 1972, he purchased 150 shares of stock in Suwannee for $27,309, payable in monthly installments *57 of $273.09 for which he issued a promissory note. During each of the years ended June 30, 1972, 1973 and 1974, petitioner's outstanding common stock was owned as follows: Percentage Stockholder
Owned
No. of Shares
George T. Dickert
34.63%
1320
J. B. Faircloth
34.63%
1320
M. J. Foley
26.81%
1022
George T. Dickert, Jr.
3.93%
150
During the same period, its officers were as follows: President
George T. Dickert
Vice President and Secretary
J. B. Faircloth
Vice President and Treasurer
M. J. Foley
Vice President and Comptroller
George T. Dickert, Jr. All of the officers were also members of Suwannee's board of directors for each of these years. In August 1974, after the merger between Suwannee and F.F.&M., Inc., detailed later, Michael T. Foley and R. M. McCain became directors of Suwannee. At the same time, Michael T. Foley became Suwannee's secretary, and R. M. McCain became vice-president. Both George Dickert and his son also remained as officers and directors of Suwannee. Jerry D. Dickert, George T. Dickert's brother, served on Suwannee's board of directors from December 1969 until December 1971. Timber Supply and Acquisitions
Suwannee's major raw material was pine saw timber. Saw timber requires a *58 minimum of between 30 and 35 years growth before it is usable in lumber manufacturing, but reaches marketable pulpwood size in an average of 18 to 25 years. Because of hauling costs, the lumber supply should ideally be within 10 miles of the mill, although 50 miles is feasible; at 75 miles, the cost becomes prohibitive. At the time Suwannee was formed in 1954, it relied heavily upon timber cutting rights on approximately 37,230 acres on the "Consolidated tract" and approximately 15,000 acres on the Crapp tract, held by Foley Lumber, to assure it of a supply, although some of the 37,230 acres had already been cut. Foley Lumber also had a right of first refusal (until 1968) on any timber offered for sale by Buckeye Cellulose Corporation (hereafter Buckeye) on an additional 500,000 acres of land. By 1961, however, the available timber on both the Consolidated tract and Crapp tract was completely cut. Moreover, in 1960, due to a lawsuit between Foley Lumber and Buckeye, Suwannee lost the benefit of Foley Lumber's right of first refusal to any timber offered for sale by Buckeye on its 500,000 acres. Payments to private land owners for the purchase of timber were generally made in a *59 lump sum in advance for all the timber sold under the contract, which usually was awarded for one to three yars. Long-term contracts made by the large companies, however, usually required payment in cash only annually, one year in advance. Sales made by the State of Florida were generally effected under one to two year contracts, and payment was required in a lump sum prior to cutting. Sales made by the United States Government from national forests did not require a lump sum payment, but rather required a downpayment only. Prior to the years in issue, large paper companies such as Rayonier Corporation, St. Regis, Georgia-Pacific, Hudson Paper, Owens-Illinois and Buckeye began acquiring holdings in Florida timberlands to obtain pulp timber for their mills. They made extensive timberland purchases and controlled other timberlands under long-term timber leases and other arrangements with private landowners. In two of the 7 counties within a reasonable distance from Suwannee's mill, including Dixie County, these companies held or controlled approximately 90 percent of the timberlands and held or controlled, on the average, about 50 percent in the remaining 5 counties. These companies *60 also competed with Suwannee for timber sold on the open market by the independent landowners. Moreover, at least in part because of the land acquisitions by the large companies, the remaining open market supply was decreased and prices were driven up. When the paper companies purchased land it was usually covered with saw timber of various sizes, suitable for both lumber manufacturing and pulpwood. The companies would then go through a "conversion" which would begin by clear cutting all the trees on a particular block of land and then replanting new trees in order to produce an even age forest on that block. To determine the amount of land to be clearcut in a given year, a company divided its acreage by the conversion period (the number of years needed to produce a tree ready for harvesting as pulpwood). By doing so, when the company was in the last year of the conversion, the oldest stand of replanted timber would be 20 years old and ready to be cut, thereby restarting the cycle. After conversion, the forest would be used to yield only pulpwood because of the longer period required to grow to saw timber size. Buckeye's 20-year iconversion program started in the early 1950's and *61 by 1970, it was 75 percent completed. Moreover, by 1970, the possibility of obtaining any substantial volume of saw timber from the "converted" land of other paper companies in the area was equally bleak, as their conversion programs were also well advanced. However, about 25 to 30 percent of the paper companies' landholdings, including Buckeye's, was unsuitable for the conversion process. This land was low, wet land dominated by cypress trees and intermingled with pine suitable for saw timber. On Buckeye's acreage, it would be possible to yield 15,000-30,000 cords annually or between 5 and 10 million board feet (assuming 300,000 acres of Buckeye's 1,000,000 acres were unsuitable for conversion). The larger companies would sell to Suwannee when they had a surplus of timber, and during the years in issue, Suwannee was purchasing approximately 60 percent of its timber supply from large companies and 40 percent from small, independent landowners. However, when there was a shortage in supply, the large companies would cut off supplies. The paper companies also traded lumber to the sawmills in exchange for chips (a waste by-product of the sawmill used by the paper companies). In *62 this regard, the paper companies were more likely to sell their saw timber to sawmills that could provide needed raw materials. Once, in mid-1959, Suwannee was forced to close down its operations for approximately three months because of poor logging conditions on the Crapp tract and its inability to purchase logs from Buckeye. After meeting with civic leaders in Dixie County over the closing, Suwannee and County officials met with Buckeye, which then agreed to sell Suwannee some timber. Suwannee also had to close down the mill on occasion for two or three days after running out of logs in the woodyard. Accordingly, Suwannee did not desire to be too dependent on the paper companies for its supply of saw timber. In the fall of 1968, Suwannee was approached by the local resident manager of Hudson Pulp and Paper Company (hereafter Hudson) who advised that Hudson was contemplating selling a large volume of timber on 265,000 acres in Dixie County to a sawmill plant and invited Suwannee to make a bid, since Suwannee had in the past bought timber from Hudson. Suwannee was outbid by Georgia Pacific for the timber by three cents per cord. Thereafter, Georgia Pacific built a chip and saw *63 mill on the south side of Cross City and began operating in fall 1969. Suwannee was then able to obtain only decreasing amounts of lumber from Hudson since Hudson now preferred to sell to Georgia Pacific. Georgia Pacific also built a plywood plant at Chiefland, Florida, 20 miles from Suwannee's mill, which increased its need for lumber in the area. A good lumber market existed in early 1969 but by late 1969, lumber demand had declined, due to increases in interest rates and a tight money supply. Corporate minutes in late 1969 mentioned the depressed nature of the lumber and building industry and stated that Suwannee must accumulate cash for timber and timberland. A serious decline in timber quality and lower lumber prices were noted in the 1970 minutes. Ideas for diversification were discussed. The 1971 minutes reflect an improving lumber market but recommended no dividend, stating, in part: "[the] timber supply continues to be a concern. No long term commitments are held. Cash is being held for possible use for this." In the December 1971 minutes, Suwannee's president reported that the company was looking for land and timber. Prior to 1972, saw timber brought a higher price *64 than pulpwood; in the years shortly before 1972, saw timber stumpage prices (the price of standing lumber without hauling or cutting costs) ranged between $10 and $20 per cord and pulpwood stumpage ranged between $5 and $10 per cord. Because of this, the independent landowners sold saw timber separately from pulpwood and the paper companies could realize a greater profit by selling saw timber to the sawmills than they could by using it in their paper mills. By 1972, however, pulpwood prices had tripled to about $30 per cord while prices of saw timber had advanced more slowly to about $40 per cord. Because the price differential between pulpwood and saw timber was no longer as significant as it had been in the past, timber owners were no longer motivated to differentiate sales of saw timber from pulpwood, and paper companies began to use saw timber in pulp production. Moreover, because of the large investment and high fixed operating costs of the mills owned by the large paper companies, they occasionally used saw timber in pulp production regardless of the cost diferential if pulpwood was in short supply. January 1972 minutes indicated an excellent lumber market but a continued *65 problem with supply. Georgia Pacific approached two of Suwannee's independent timber suppliers and offered them higher prices. Because the two supliers had good relations with Suwannee, however, they ofered it the opportunity to purchase the lumber at the prices bid by Georgia Pacific. Dickert, in a message to the directors, as reflected in the company's minutes of November 10, 1972, reported that it was "imperative that the company keep a good cash position of possibly $500,000 to be used for timber purchases." The $500,000 figure was deemed by Dickert to be the amount of reserve required to be able to purchase an additional 10 week supply of timber if a landowner decided to place timber on the market on short notice. In December 1972, Suwannee acquired the so-called Barber tract, a timbered tract of land of about 400 acres in Dixie County for $130,000. On its balance sheet, Suwannee allocated $70,000 of the purchase price to timber and $60,000 to land. In the year of purchase, Suwannee paid $30,000 in cash, with the balance of the purchase price represented by a mortgage and note payable in the amount of $100,000, with annual payments of principal of $10,000, plus interest *66 on the unpaid balance at 6 percent per annum. The timber was ready to be cut if Suwannee needed it immediately or could be left standing as long as necessary. Suwannee cut the tract in fall 1974 due to the high price of stumpage on the open market at that time. After permitting the land to lay fallow for about 1 year, Suwannee reforested the entire 400 acres in 1976 at a cost of about $25,000. Suwannee's June 1973 minutes again refer to the serious problem of timber supply, the prior acquisiton of the Barber tract, its hope to acquire a second 400 acre tract for $200,000 and Foley's personal efforts in connection with the possible purchase of two tracts of land owned by friends. The need to retain company funds in connection with timber and land acquisitions was also noted. Suwannee's July 1973 minutes noted that the lumber market continued to be extremely good but that building permits were declining and interest rates had increased to the highest level in years, thus indicating a downturn in the lumber market. Timber stumpage prices reached $100 per 1000 board feet, and the necessity of keeping large cash balances to buy land and timber was emphasized. The September minutes *67 mentioned the falling prices of lumber and increasing timber prices, and the board of directors was asked by Suwannee's president to seek additional land and timber to support the mill operation. Suwannee made a number of bids to acquire land and timber during the period involved. Most of the tracts bid on were relatively small, although Suwannee did investigate the possibility of purchasing a 20,000 acre tract from one of its suppliers. Suwannee generally did not retain copies of the bids and was not sure how many bids were made. In general, however, Suwannee could not compete successfully with the large paper companies. In December 1974, Suwannee acquired a tract of land comprised of approximately 139 acres in Hawthorne, Alachua County, Florida for $156,000 (hereafter the Starke tract).As part of the purchase price, Suwannee gave the sellers a mortgage on the property and a note in the amount of $110,707, payable in annual installments of $11,070.70, plus interest at the rate of 8 1/2 percent per annum. The balance of the purchase price ($45,293) was paid in cash during 1974. Throughout 1974 and u975, Suwannee's minutes reflect continued concern over the timber supply problem *68 and diminished demand for its manufactured lumber. Dickert was directed to investigate the feasibility of continuing the pine sawmill facility at Shamrock because of the age of the equipment and replacement cost and the availability and quality of timber.In September 1974, Suwannee's directors discussed shutting down or reducing mill operations due to the difficulty in obtaining logs and a general unprofitable trend in operations. By November 1974, Dickert was instructed to review the feasibility of continuing sawmill operations on a monthly basis. In April 1975, it was noted that several mills in the area had shut down due to economic conditions and reduced chip demand from pulp mills. Although timber was available, the price was too high to produce lumber at a profit. General Economic Conditions
During the period 1971 through 1974, general economic conditions in the United States were marked by high inflation and efforts to control it. In August 1971, the Nixon administration adopted a stabilization program to control cost inflation with direct controls, which were relaxed in early January 1973. Consumer prices increased approximately 3.8 percent between 1971 and 1972 and 5.2 *69 percent for the first half of 1973 over the first half of 1972. Retail prices rose about 8 percent during 1973. Wholesale prices increased 4.1 percent between 1971 and 1972 and increased 11.3 percent for the first half of 1973 over the first half of 1972. Between 1972 and the end of 1973, the wholesale price index rose 18.2 percent. Refined petroleum product prices rose rapidly in 1973 and in the summer of 1973, OPEC nations placed a total embargo on oil shipments to the United States increasing economic dislocation. The volume of housing starts dropped off drastically from an annual rate of 204,400 units in September 1972 to a level of 146,300 in September 1973, primarily because of high mortgage rates which rose to a maximum of 9.5 percent. Similarly, the prime rate for borrowers continued to rise in 1973 and reached a peak of 10 percent in early September. Suwannee was subject to the same inflationary pressures as was the general economy, experiencing a doubling of the prices it paid for timber stumpage between 1969 and mid-1974, with the largest increase occurring in late 1972. In addition, Suwannee experienced large increases in the cost of petroleum, petroleum products, *70 and wages. Suwannee attempted to pass on these added costs to its purchasers. Florida Forest Products
Florida Forest Products, Inc. (hereafter F.F.P.) is a Florida corporation whose principal place of business was in the Largo, Florida, area at all relevant times. F.F.P. was initially engaged primarily in the business of selling gypsum products, but it later added lines of lumber products, insulation, metal, and other construction materials. Its sales were primarily made at wholesale to building contractors and subcontractors who built homes, apartments, commercial properties, shopping centers, government construction, or, in general, were in the building market. F.F.P. was owned by John McCain who, by 1971, desired to sell it. In April 1971, Michael Foley learned from Michael McCain, John's son, that McCain was contemplating selling the business. Michael Foley, M. J. Foley, and Michael McCain then began efforts to purchase F.F.P. If uccessful, they intended to substantially expand the business and at the initial meetings between Michael McCain and the Foleys, the possibility of additional sales outlets was discussed. On August 26, 1971, F.F.&M. Incorporated (hereafter F.F.&M.) *71 was incorporated by the Foleys and Michael McCain under the laws of the State of Florida to purchase F.F.P. Its principal assets was its 100 percent ownership of F.F.P., which it purchased in early September 1971.At the time of purchase, F.F.P. rented a warehouse from John McCain in Largo from which it conducted its business. Immediately after F.F.&M. acquired F.F.P., M. J. Foley asked Michael Foley to determine the costs to open a second place of business in Tampa, including warehouse rental, equipment required, inventory, and accounts receivable. He also wanted to know whether F.F.P. had the money available to make the move within a year. In October 1972, M. J. Foley asked Michael Foley and Michael McCain to work on both short and long-range plans for F.F.P., setting forth objectives, assumptions, strategies, and action plans. F.F.P. was interested in first acquiring real estate in Largo and Tampa to replace the leased facilities with its own warehouses, with initial funding to be provided by the Foley family, and then proceeding with expansion. At the same time, F.F.P. considered opening a satellite facility in St. Petersburg and a facility in Port Richey. F.F.P also decided *72 that it should attempt to open at least one yard a year. Although the locations were not set, F.F.P. did have certain areas it was considering.F.F.P.'s actual expansion between 1971 and 1974 was as follows: Date
Location
Action
September, 1971
Largo
Initial wholesale distribution
outlet in leased facilities
February, 1972
Tampa
Addition of new wholesale dis-
tribution outlet on leased
premises
December, 1972
Largo
New warehouse distribution
outlet on purchased property
March, 1973
Tampa
New wholesale distribution
outlet on purchased property
December, 1973
Port Richey
New wholesale distribution
outlet
April, 1974
Jacksonville
New wholesale distribution
outlet
1974
Largo
Purchased added property for
expansion of facilities. The approximate capital investment anticipated in spring 1973 for each new location was $200,000, including the cost for land, inventory, and equipment, and over the next 3 years, Michael Foley anticipated F.F.P. would need $1,000,000 to expand (with additional funds needed for retirement of bank debt). However, he never mentioned this figure to Suwannee's board of directors. In April 1972, George Dickert asked M. J. Foley if the F.F.&M. shareholders were interested in having the company acquired *73 by Suwannee. At that time both Michael McCain and Michael Foley were not interested in such a sale; however, on July 14, 1973, a meeting was held between Suwannee and F.F.P., exploring ideas regarding a possible merger. Although no final decision was made to merge, both companies reached the conclusion that a merger would be mutually beneficial. During the July 1973 merger discussions, Suwannee was advised by F.F.P. that it would need a great deal of capital for expansion, although no specific amount was discussed. Faircloth guessed that F.F.P. would require $3000,000 (to be contributed by Suwannee) based upon its financial statements; Dickert believed that Suwannee would have to contribute about $400,000, part of which would be necessary to retire F.F.P's bank debt; and Foley estimated Suwannee would need to contribute between $500,000 and $600,000. On November 27, 1973, Suwannee and F.F.&. agreed on an accountant to study the two companies' balance sheets and operation statements as a basis for merger. Negotiations continued through April 1974 as terms were worked out.
By spring 1974, F.F.P. planned to open a new warehouse and outlet in Jacksonville and to expand its Tampa warehouse.Dickert *74 assured F.F.P. that because of the impending merger, Suwannee would make funds available, and F.F.P. signed a lease effective July 1; however, the lessor allowed F.F.P. 2 months free rent and F.F.P. was thus ready to open at the end of April.
On July 1, 1974, Suwannee acquired substantially all of F.F.&M.'s properties in a statutory merger, pursuant to Florida law, in which Suwannee was the surviving corporation. Accordingly, F.F.P. theretofore a subsidiary of F.F.&M., became a wholly-owned subsidiary of Suwannee. The merger was effected by the exchange of 1,758 shares of Suwannee's common stock (issued by Suwannee) for all of F.F.&M's shares, which were thereupon cancelled. For the fiscal years ending March 31, 1971, through June 30, 1976, the income (or loss) of F.F.P., as reported on its Federal income tax returns, was as follows: Year
Income (Loss)
3/31/73 $ 19,295 3/31/74
315,866 3/31/74 to 6/30/74
(2,683)
6/30/75
(320,596)
6/30/76
(163,326)
In July 1974, Suwannee loaned F.F.P. $100,000 at 12 percent interest, of which $40,000 was used for the Tampa warehouse expansion and $60,000 for working capital in connection with the Jacksonville operation. At about the time F.F.P. opened its *75 Jacksonville warehouse, its sales began to decline and in January 1975, F.F.P. showed a loss. When the building industry in Florida went into a steep decline during the first half of 1975, F.F.P.'s sales dropped dramatically. Initially, F.F.P. believed that the decline would be only temporary, but because of the severe losses it was incurring, F.F.P. had to discontinue expansion. Between October 1974 and June 30, 1975, Suwannee loaned an additional $350,000 to F.F.P., evidenced by promissory notes. The dates and amounts of each such advance and the interest rate thereon were as follows: Date
Amount of Advance
Rate of Interest
October 1974
$150,000
13%
February 1975
100,000
11%
March 1975
100,000
10% Th $150,000 was used to pay F.F.P.'s indebtedness to the Atlantic National Bank of Jacksonville. Similarly, the $100,000 loan made in February was used to retire some of F.F.P.'s line of credit at the Southeast Bank of Largo after the bank began to reduce F.F.P.'s credit and requested F.F.P. to reduce its outstanding bank debt. Moreover, on February 24, 1975, Suwannee guaranteed $200,000 of F.F.P.'s obligations to the Southeast Bank of Largo in order to secure F.F.P. a line of credit. On September *76 10, 1975, the four separate notes due Suwannee from F.F.P. were consolidated, and a new note for $450,000 was executed by F.F.P. An aditional $100,000 was loaned F.F.P. by Suwannee in March or April 1976. The following reflects the consolidated balance sheets of F.F.&M. and F.F.P. as set forth in their consolidated tax returns for years ending 3/31/73 and 3/31/74, all prior to F.F.&M.'s merger into Suwannee. Also shown are material items from the consolidated income statements for the 1973 and 1974 fiscal years. Beginning
End
End
of FYE
of FYE
of FYE
3/31/73
3/31/73
3/31/74
Cash
5,685
71,236
49,778
Trade Notes and
Accounts Receivable
299,055
431,700
660,982
Less Allowance for
Bad Debts
(17,268)
(27,000)
Inventories
134,329
247,872
401,579
Other Current Assets
20,180
11,298
42,673
Fixed Assets
130,360
319,089
544,958
Accumulated Depreci-
ation
(30,727)
(60,273)
(93,835)
Land
107,750
93,821
Goodwill net of
amortization
165,952
159,241
155,096
Other assets
5,273
6,199
Total
$724,834
$1,275,918
$1,834,251
Accounts Payable
340,002
494,932
595,211
Notes Payable & Mort-
gage due in 1 yr.
68,305
47,067
84,357
Other Current Liabilities
34,839
48,383
341,603
Long-term notes,
mortgages
210,466
617,150
544,711
Net Sales
3,414,985
5,672,476
Cost of Goods Sold
2,768,247
4,405,171
Operating Expenses
643,891
960,726
Materials Purchased
2,881,791
4,558,878
*77 Florida Income Tax
The State of Florida enacted a 5 percent corporate income tax in 1972, thereby icreasing Suwannee's total taxes, and thus costs, by 2.6 percent (after taking into account the reduction of Federal corporate income tax resulting from the deduction allowable for State income taxes). Forest Sales
Forest Sales Corporation (hereafter Forest Sales) was a corporation formed in 1969, which had its principal office and place of business in Augusta, Georgia. Forest Sales marketed finished lumber to retail companies and industrial customers in North and South Carolina, Tennessee, Georgia, and Florida for lumber manufacturers, including Suwannee, for whom it acted as a lumber wholesaler. [3] By 1973, Forest Sales had annual sales of $17,000,000. Between *78 February 1, 1969 and March 15, 1971, Suwannee loaned $300,000 to Forest Sales. These funds were borrowed so that Forest Sales could carry its accounts receivable, which had greatly increased during the Southeast building boom in 1972 and 1973. Forest Sales could not obtain all the necessary funding from banks and had to turn to the manufacturers as an additional source. The loans were secured by promissory notes pyable on demand and personally guaranteed by Forest Sales' shareholders. The notes bore interest fully competitive with prevailing interest rates at the time, varying between 6-3/4 percent and 9-1/2 percent. During Suwanne's fiscal years ending June 30, 1972 and June 30, 1973, $250,000 of the loans remained outstanding. In 1974, as Forest Sales' sales declined, its cash balance improved because the amount of its outstanding receivables declined. This enabled Forest Sales to borrow funds from other lending institutions to repay the loans. Suwannee was repaid in full during its fiscal year ending June 30, 1974. Suwanne also loaned Forest Sales an additional $100,000 in September 1974 for two weeks to enable Forest Sales to take advantage of a purchase discount on a large *79 sales order which required payment within ten days. At the time Forest Sales was formed in 1969, Suwannee owned 25 percent of its stock, which it later sold to George Dickert. Suwannee originally purchased the stock because it anticipated Forest Sales would make sales of its lumber in states outside Florida. Forest Sales also exchanged valuable market information with Suwannee and other manufacturing companies whose lumber products it sold. During the years in issue, outstanding stock in Forest Sales was owned as follows: George T. Dickert
25%
Jerry D. Dickert
25%
Kenneth E. Knight
30%
Donald A. Grantham
20%
Applied Management Sciences, Inc.
Pursuant to a letter agreement dated December 3, 1973, and a promissory note dated November 30, 1973, Suwannee loaned $40,000 to Applied Management Sciences, Inc. (hereafter Applied Management). Applied Management is a Delaware corporation located in Glenview, Illinois, engaged primarily in marketing insurance programs, conducting marketing seminars and programs on a contract basis for retail grocers, oil companies, and other similar clients. Suwannee had the right to convert its loan to Applied Management stock, and George Dickert became a member *80 of Applied Management's board of directors on December 27, 1974. Green Mountain Communications (hereafter GMC) became interested in merging with Applied Management and offered to acquire the Applied Management note from Suwannee in exchange for 1,600 shares of GMC. Suwannee accepted the offer and on June 19, 1975, Suwannee sold its shares of GMC for $20,000, thereby suffering a $20,000 loss. Entertainment Media, Ltd.
Effective October 20, 1973, Suwannee entered into an agreement with Entertainment Media, Ltd. (hereinafter Entertainment Media), under which it was required to extend loans from time to time to Entertainment Media in a total amount not in excess of $100,000 during the period November 1, 1973 through December 31, 1974. These loans were to bear interest at a competitive rate, to be secured, and to be repaid on or before December 31, 1974. Suwannee also retained the right to convert the loan into Entertainment Media stock. Effective March 1, 1976, Suwannee and Entertainment Media entered into an amended agreement whereby Suwannee extended the due date on the $100,000 owed it by Entertainment Media until July 31, 1978. Fence Post Production
During 1973 Suwannee was *81 considering the feasibility of engaging in the manufacture and sale of fence posts. Fence posts are produced from small premerchantable pulpwood trees and were in ample supply. A preliminary study was commenced in July 1973 by Dickert, and another study to review machinery used to peel bark, was completed by his son in July 1974, recommending that Suwannee go into post production. Based upon the study, it was determined that the posts could be manufactured with a $50,000 investment in additional machinery and inventory. Increased labor would also cost an additional $50,000 for the first year's operation, all of which Suwannee expected to pay for in cash. Suwannee purchased a post peeler for use in the process on or about May 15, 1975, but at the time of trial the post peeling operations had not been put into effect. Montgomery Blow Hog
Suwannee purchased and placed into service a blow hog used to grind cypress bark on February 5, 1973 at a cost of $6,600. Additional labor cost was $6,500 annually. Second Treating Cylinder
Due to Suwannee's increased business, on May 31, 1972, it purchased for $18,854 and placed into service a second treating cylinder used to pressure treat lumber *82 with chemicals. Suwannee's annual operating costs increased by $55,000 because of the added treating cylinder, $25,000 for added labor and $30,000 for increased inventory. Riderless Carriage
By June 1972, Suwannee anticipated purchasing, in the near future, a Corinth Riderless Carriage at a cost of $15,000. The purchase was, in fact, made on December 26, 1972. Acquisition of Trucks from George Dickert, Inc.
On March 13, 1975, Suwannee purchased a group of trucks and trailers from George Dickert, Inc. (a corporation controlled by Suwannee's President) for $40,200.95. The trucks had previously been used by George Dickert, Inc. to transport and deliver lumber from Suwannee's mill. George Dickert, Inc., had performed this service since Suwannee's inception, due to Suwannee's inability to fund its own operation. In 1972 or 1973, Suwannee first approached Dickert about selling the trucks because is other shareholders felt that the mills' hauling should be done by Suwannee now that Suwannee could afford to purchase the equipment (which at that time would have been valued at about $100,000). While Dickert did not wish to sell, he eventually gave in to Suwannee's pressure. Suwannee did *83 not attempt to buy trucks from anyone else during this period. New Retail Store at Cross City
Because there were no retail sales outlets for lumber in Dixie County, customers regularly came to the mill site to purchase lumber. However, such activity created safety problems and interfered with Suwannee's operations. At one point in 1973, Suwannee refused to make retail sales at the site, but this caused ill-will thereby confirming the need for a retail outlet. In 1972, and u973, Dickert made a study of a retail store's potential profitability, and he discussed plans to construct a new retail store in Corss City with Foley and Faircloth. The estimated cost for such an outlet was about $75,000, including inventory and some minor additional expenses for equipment.However, plans for the retail outlet had to be deferred until the lease on the mill site was renegotiated.Construction on the store began in early 1976 and was completed in about December of that year. New Office Facility
Suwannee's business officers were located in its mill yard and were inadequate for its needs. The building was too small and duty (because of its location) and as early as 1970 Suwannee contemplated building *84 a new office. Again, no plans could be made until Suwannee renegotiated the terms of its lease with Shamrock. The expected cost in 1972-1974 of the building and equipment to be used in the office was approximately $50,000. The new lease was signed in March 1975, and actual work began in summer 1976. Water Pollution Control
In 1972 or 1973, Suwannee was cited for letting chemicals from its pressure treating wood preserving plant flow into water near the site. In either 1973 or 1974, Suwannee spent approximately $25,000 in modifying the plant to meet the environmental standards. Self-Insurance Risk for Workmen's Compensation
Suwannee's manufacturing operation was highly dangerous and there had been several deaths and serious accidents throughout the years. Workmen's compensation coverage was mandatory and Suwannee acted as its own self-insurer for losses as set forth by the Florida Industrial Commission.Losses might exceed the rates set forth by the Commission, however, and to the extent that Suwannee's losses might exceed the mandatory's rates, it carried insurance for the excess. Suwannee was required to place a $25,000 cash deposit with the Industrial Commission for such pruposes. *85 Dickert estimated that Suwannee's yearly self-insurance expenses amounted to about 12 percent of its annual payroll.
Financial Condition
Suwannee generally had not borrowed from banks since the early 1960's and any loans it undertook at that time had to be personally endorsed by the shareholders because of its size and financial condition. When Suwannee was formed the maximum debt limitation allowed under its charter was $400,000. Due to Suwannee's desire to be able to borrow on its own, however, this limitation was later removed. In 1968 or 1969, Suwannee paid off the original bank debt it incurred when it purchased its business. In 1970 and 1973, Suwannee declared stock dividends, recapitalizing its earned surplus to be paid in capital in the following amounts: Amount of Earned Surplus Trans- Year Ended
ferred to Paid in Capital
June 30, 1970
$153,000.00
June 30, 1973
$637,000.00
Suwannee did not make any loans or advances to its shareholders during the fiscal years ending June 30, 1972, June 30, 1973, and June 30, 1974, nor were there any expenditures made for the shareholders' personal benefit. Through the taxable year ending June 30, 1972, Suwannee had not paid any cash dividends *86 to its shareholders. For each of the years ending June 30, 1973 and June 30, 1974, cash dividends were paid at $5/share for a total of $19,110. Whenever the question of a dividend was raised, however, Dickert objected because he felt Suwannee needed all its cash for current operations or expansion. Dickert was, at all times relevant, aware of the section 531 tax, on accumulated earnings. Suwannee owned life insurance policies covering the life of George T. Dickert during the years involved, the cash values of which at the end of the fiscal years were as follows: 6/30/72
6/30/73
6/30/74
6/30/75
6/30/76
$39,105
$43,550
$48,740
$63,510
$9,168
During Suwannee's year ended June 30, 1976, it borrowed $54,342 against the cash surrender value of such policies. Suwannee's sales of lumber, in board feet, for the fiscal years 1971-1974 were as follows: Year Ended
Board Feet
June 1971
18,414,265
June 1972
19,958,139
June 1973
20,738,613
June 1974
18,184,573 Suwannee's sales for 1962 through 1975 were: Year
Gross
December 31, 1962 $ 849,014
December 31, 1963
1,053,476
December 31, 1964
1,142,772
December 31, 1965
1,407,064
December 31, 1966
1,710,737
December 31, 1967
1,695,284
December 31, 1968
2,313,677
June 30, 1969
1,511,896
June 30, 1970
2,647,075
June 30, 1971
2,544,536
June 30, 1972
3,293,631
June 30, 1973
4,096,088
June 30, 1974
3,909,904
June 30, 1975
2,472,527
Suwannee's *87 net profit (loss) and accumulated profits, as recorded on its books for the years 1955 through June 30, 1970 were as follows: Year
Profit (Loss)
Earned Surplus
December 31, 1955 $ 119.31 $ 119.31
December 31, 1956
1,810.45
1,929.76
December 31, 1957
(40,556.28)
(38,626.52)
December 31, 1958
(7,872.71)
(46,499.23)
December 31, 1959
(2,948.95)
(49,222.65)
December 31, 1960
36,177.87
13,044.78
December 31, 1961
28,220.48
$15,175.70
December 31, 1962
15,175.70
30,196.99
December 31, 1963
18,384.25
46,084.99
December 31, 1964
19,363.20
64,549.13
December 31, 1965
18,829.96
82,635.28
December 31, 1966
39,373.06
120,964.00
December 31, 1967
32,690.85
152,629.63
December 31, 1968
162,443.03
321,099.04
June 30, 1969
71,230.89
392,329.93
June 30, 1970
44,071.60
283,401.53 Suwannee's income tax returns reflect the following figures: 6/30/71
6/30/72
Gross Receipts
$2,544,536
$3,293,631
Cost of Goods Sold
(2,136,000)
(2,785,895)
Gross Profit $ 408,536 $ 507,736
Other Income (not
incl'd in sales)
38,274
42,775
Total Deductions *
305,836
375,232
Depreciation
50,867
52,389
Contributions
145
635
Pension, Profit
Sharing
30,988
33,364
Estimated Taxes
Paid
45,000
Accounts Payable
43,334
42,835
Other Current liabs.
129,407
130,434
Total
$172,741
$173,269
Inventory
100,647
120,060
Trade Notes and
188,776
186,090
Accounts Receive-
able (Sch L, Line 2)
6/30/73
6/30 74
Gross Receipts
$4,096,088
$3,909,904
Cost of Goods Sold
(2,847,185)
(3,118,096)
Gross Profit
$1,248,903 $ 791,808
Other Income (not
incl'd in sales)
71,770
151,235
Total Deductions *
440,308
479,366
Depreciation
40,066
25,973
Contributions
1,010
590
Pension, Profit
Sharing
38,077
46,312
Estimated Taxes
Paid
73,000
243,222
Accounts Payable
77,830
97,077
Other Current liabs.
479,989
39,048
Total
$557,819
$136,125
Inventory
219,833
[4] *89 376,068 Trade Notes and
280,440
366,072
Accounts Receiv-
able(Sch L, Line 2)
*88 Suwannee's books reflect the following information: 6/30/71
6/30/72
6/30/73
Cash on hand
127,142.63
222,251.67
850,630.46
Accounts Receivable: Income Tax Refund
Customers
142,611.84
144,286.14
140,655.61
Loggers
Affiliates
21,022.66
37,991.04
89,367.09
163,634.50
182,277.18
230,022.70
Accrued Interest Receivable
Cash Value of Life Insurance
34,485.34
39,105.47
43,549.59
Employee Credit Fund
1,500.00
1,500.00
1,500.00
Inventory - Wood
Lumber
87,836.00
110,379.69
209,642.80
Logs
8,131.11
9,680.31
10,190.00
Gas
1,581.09
1,659.01
2,645.74
Supplies
3,100.00
3,100.00
3,100.00
100,648.20
124,819.01
225,578.54
Depreciable Properties - Building
40,973.92
42,904.00
42,094.00
Machine & Equip.
224,165.95
243,981.00
268,709.00
Automobile
159,713.86
159,663.00
157,863.00
Office Equip.
7,208.56
6,392.07
7,287.07
Reserve for Depreciation
(311,371.44)
(348,172.77)
382,738.82)
120,690.85
103,957.30
93,214.25
Prepaid Insurance
15,432.25
15,759.52
14,843.02
Prepaid Occupational licenses
37.50
37.50
37.50
Prepaid Corporate Income Taxes
Prepaid State Income Taxes
Investment in Florida Forest Products
Amortization of Good Will
Plantation Road Project
Deposit on land
1,500.00
Land
60,000.00
Timber
70,000.00
563,621.27
691,207.65
1,589,382.26
6/30/74
6/30/75
6/30/76
Cash on hand
723,189.39
87,667.97
66,738.75
Accounts Receivable: Income Tax Refund
32,708.37
Customers
152,403.23
141,718.38
181,730.02
Loggers
24,651.90
8,014.53
18,890.00
Affiliates
19,515.90
43,421.65
78,473.81
229,279.40
193,154.56
279,093.83
Accrued Interest Receivable
11,661.78
5,635.27
9,221.27
Cash Value of Life Insurance
48,740.44
63,510.14
9,168.91
Employee Credit Fund
1,500.00
1,500.00
1,500.00
Inventory - Wood
Lumber
336,100.00
290,286.00
588,174.90
Logs
39,968.00
13,171.00
53,242.80
Gas
7,144.96
8,680.69
4,832.74
Supplies
3,100.00
16,292.70
3,100.00
386,312.96
[5] 399,075.80 649,350.44
Depreciable Properties - Building
42,904.37
42,094.37
44,822.55
Machine & Equip.
268,708.59
277,821.87
285,925.27
Automobile
150,980.49
191,191.44
201,048.54
Office Equip.
7,077.26
6,582.26
7,562.46
Reserve for Depreciation
(401,515.29)
(431,851.05)
(460,124.90)
67,345.42
79,914.89
79,233.86
Prepaid Insurance
18,020.85
23,743.87
34,992.16
Prepaid Occupational licenses
37.50
37.50
37.50
Prepaid Corporate Income Taxes
71,765.42
Prepaid State Income Taxes
1,875.00
Investment in Florida Forest Products
212,103.65
212,103.65
Amortization of Good Will
( 15,889.65)
( 20,034.77)
Plantation Road Project
67,984.04
Deposit on land
5,000.00
25,000.00
Land
60,000.00
Timber
23,659.25
216,060.00
243,319.00
1,542,038.62
1,275,433.01
1,657,708.64
*90 6/30/71
6/30/72
6/30/73
Forest Sales Corporation -
Notes Rec.
252,812.50
251,458.33
251,458.33
Applied Management Sciences - Notes Rec.
Don Grantham Notes Receivable
4,045.00
3,017.50
3,017.50
Entertainment Media - Notes Rec.
George Thomas Dickert Notes Rec.
22,309.00
17,309.00
Florida Forest Products
256,857.50
276,784.83
271,784.83
Total Assets
820,478.77
967,992.48
1,861,167.09
Notes Payable - Dr. G. H. Starke
Accounts Payable
42,389.66
64,784.84
63,295.31
Notes Payable - Barker, Barber & Jackson
100,000.00
Accrued legal and audit
3,000.00
4,500.00
3,500.00
Accrued Insurance
14,745.00
Social Security Taxes
7.88
297.07
17.59
W/H Taxes
688.00
State U/C Taxes
232.92
136.04
57.81
Federal U/C Taxes
618.52
755.70
837.96
Florida Sales Tax
101.05
91.52
24.29
Workman's Comp. Insurance
280.68
645.13
1,099.24
Insurance Claims payable
4,316.49
2,653.53
496.97
Commissions payable
820.90
1,075.60
Accrued taxes and licenses
7,909.11
7,355.33
7,709.03
Accrued payroll
2,107.33
8,058.91
7,851.19
Federal Income Taxes payable
59,581.00
30,312.00
341,558.00
Accrued Contribution to
Profit Sharing
30,987.70
32,364.05
34,960.36
Employee Group Insurance
396.30
393.56
672.46
State Income Taxes payable
4,354.00
37,304.00
Accrued Interest
3,000.00
Cash Dividends payable
19,110.00
Due to Subsidiary
Capital Stock
306,000.00
318,500.00
955,500.00
Additional Paid in Capital
14,809.00
14,809.00
Earned Surplus
362,521.83
462,548.80
271,831.68
Total Liabilities & Owner's
Equity
[1] 820,478.77 967,992.48
1,861,167.09
*91 6/30/74
6/30/75
6/30/76
15,425.93
Forest Sales Corporation - Notes Rec.
Applied Management Sciences - Notes Rec.
40,000.00
Don Grantham Notes Receivable
3,030.00
3,025.00
2,268.75
Entertainment Media - Notes Rec.
100,000.00
100,000.00
100,000.00
George Thomas Dickert Notes Rec.
14,809.00
14,809.00
10,650.51
Florida Forest Products
450,000.00
550,000.00
157,839.00
567,834.00
[1] 662,919.26 Total Assets
1,732,585.99
1,843,267.01
2,336,053.83
Notes Payable - Dr. G. H. Starke
110,811.27
99,730.14
Accounts Payable
97,077.15
56,764.65
157,686.83
Notes Payable - Barker,
Barber & Jackson
90,000.00
80,000.00
70,000.00
Accrued legal and audit
7,500.00
8,000.00
7,000.00
Accrued Insurance
Social Security Taxes
162.03
1.04
440.87
W/H Taxes
State U/C Taxes
.01
4,937.19
Federal U/C Taxes
756.92
685.42
748.06
Florida Sales Tax
14.42
124.36
147.85
Workman's payable
368.11
271.44
110.15
Insurance Claims payable
1,567.50
1,567.50
4,053.20
Commissions payable
2,540.50
1,753.87
2,269.90
Accrued taxes and licenses
7,709.03
2,086.92
2,672.90
Accrued payroll
9,002.09
9,832.81
2,467.25
Federal Income Taxes payable
13,016.58
Accrued Contribution to Profit Sharing
41,199.85
37,921.00
Employee Group Insurance
706.49
State Income Taxes payable
Accrued Interest
2,700.00
7,109.48
8,072.55
Cash Dividends payable
162,136.01
326,636.01
Due to Subsidiary
162,136.01
326,636.01
Capital Stock
955,500.00
1,395,000.00
1,395,000.00
Additional Paid in Capital
14,809.00
Earned Surplus
503,446.16
7,123.83
204,245.39
Total Liabilities & Owner's
Equity
[1] 1,732,585.99 [1] 1,843,267.01 [1] 2,336,053.83 *92 Issue 2: Reasonable Compensation
Respondent disallowed a deduction for certain amounts paid by Suwannee as compensation to J.B. Faircloth and M. J. Foley as follows: J. B. Faircloth
June 30, 1972
June 30, 1973
June 30, 1974
Amount Paid
$15,000
$20,000
$20,000
Amount Allowed
5,000
5,000
5,000
Amount Disallowed
10,000
15,000
15,000
M. J. Foley
June 30, 1972
June 30, 1973
June 30, 1974
Amount Paid
$15,000
$20,000
$20,000
Amount Allowed
5,000
5,000
5,000
Amount Disallowed
10,000
15,000
15,000
Between 1955 through 1961, Dickert's compensation was $12,000 per year, but no compensation was paid to Faircloth or M. J. Foley prior to 1962. Their salaries for 1962 through 1971 were: Year
Dickert
Faircloth
Foley
1971
$45,000
$15,000
$ 15,000
1970
45,000
15,000
15,000
1969
45,000
15,000
15,000
1968
25,000
10,000
10,000
1967
18,000
7,500 7,500
1966
18,000
5,000
5,000
1965
12,000
5,000
5,000
1964
12,000
4,000
4,000
1963
12,000
4,000
4,000
1962
12,000
3,000
3,000
Suwannee's minutes of November 17, 1965, state, in part: It had been a policy of the Company to suspend payments for services that were rightly *93 due to the Board because of the heavy debt situation and limited earnings. The board is of the opinion that the turning point has been reached and they should be compensated more for current services with the thought that in the future their compensation should be increased even more to recompense them for services during the lean years. As business developed, Suwannee increased the compensation of Faircloth and M. J. Foley to $10,000 per year in 1968, in recognition of heir efforts to promote Suwannee's success. Suwannee's board of directors' minutes in 1971 state in part: * * * The President, George T. Dickert, stated that in his opinion, Suwannee Lumber * * * had proven a financial success. He was emphatic when he stated that the success of the company was due, in his opinion, to the excellent counsel and advise given by the officers and directors J.B. Faricloth and M. J. Foley. At Suwannee's August 1972 board meeting, it was determined that a study by made of executive salaries in comparable jobs in related and other industries, with a report to be made at the next directors' meeting. M. J. Foley made this study and reported to the board at the November 1972 meeting. On *94 the basis of the report, Suwannee's board concluded that executive salaries in comparable companies were higher than those which it paid to its officers with similar positions, and as a result Suwannee increased its officers' compensation. Foley did not verify, however, whether the individual to whom he compared Faircloth to determine Faircloth's salary had any business endeavors in addition to his responsibilities to his employer, as did Faircloth. When Dickert decided to organize Suwannee in 1954, he sought Faircloth as a co-venturer for both his capital and his credit and because of his excellent personal and business contacts in the Perry area. Faircloth had resided in the Perry, Florida area for over 30 years. His experience had included operating service stations and a sawmill employing approximately 25 men. Since 1946, he had been the International Harvester dealer in Perry, Florida, and between 1958 and 1972, he was Judge of the Small Claims Court in Taylor County, Florida, which required about three hours a week. He also had served as a drector of the LOP&G Railroad and in the early 1940's served as an elected county commissioner for Taylor County, Florida. During the *95 years in issue, Faircloth devoted about 75 percent of his working time to his International Harvesterdealership. Through this dealership and his business background in Taylor County Faircloth did a great deal of business with persons in the logging and timber industry and had developed personal contacts and relations with officers, employees and management of luber mills, with loggers and with timber procurement and sales employees of major paper and pulp manufacturers. Through these contacts Faircloth obtained important business information which related to availability of timber, logging information, activities of lumber mills, business activities and policies of the area's major paper and pulp manufacturing companies, and other information important to Suwannee in the conduct of its business. Much of this information, however, was as important to Faircloth in his own business endeavors as it was to Suwannee. This information was not commerically available but other persons could be hired (as salaried employees) to provide similar services and information. Since 1961, on most Tuesday evenings, Faircloth entertained persons important to both Suwannee and his own business, including *96 loggers, lumber mills personnel, foresters, timber sales and procurement employees of companies, including the major paper and pulp companies in the area, other sawmill operators, and other persons in the Perry area. These social activities aided both Faircloth's personal business and Suwannee by building goodwill and affording an opportunity to discuss matters pertinent to both businesses on an informal basis including becoming aware of timber or timberland for sale and the price that timber would bring. Faircloth was "back up" managment to Dickert in the event Dickert was unable to manage the day-to-day operations of the mill but was called upon to do so only once or twice. Aboutonce a week, Faircloth would visit the mill to keep in personal contact with the key employees.Although they would occasionally discuss running the mill, no working relationship was maintained with them, however, and the primary purpose of the visits was to sustain good personal relations between Faircloth and the employees. Faircloth would also meet with Dickert during these visits. Periodically, Faircloth had other conversations with Dickert to discuss hauling charges and to comment on Suwannee's selection *97 of loggers. He also attempted to help solve the timber supply problem, helped evaluate the F.F.P. acquisition and urged the purchase of trucks from Dickert. He was not, however, familiar with the pertinent facts concerning the Entertainment Media loan. M. J. Foley was in his mid-60's in the taxable years involved. He graduated from Notre Dame Universithy with a degree in Economics, studied law for 2 years, and had been employed in lumber manufacturing and in paper and newsprint production since the mid-1930's. Until 1948, he served as President of Brooks-Scanlon Corporation, a large Florida lumber company with 1,000 employees, 450,000 acres of land, and a railroad and extensive holdings in the Bahamas and Cuba. In 1948, he became Vice President and later President of Powell River Company, Ltd., the largest newsprint producer in Canada, and had responsibility for its operations and its 3,500 employees. The company also produced sulfide pulp and lumber. He was with that company until approximately 1960, when he joined Anglo-Canadian Pulp and Paper Mills, Ltd. (hereafter Anglo-Canadian), another large newsprint company in Canada, and for which he worked until his retirement in *98 April 1973. Prior to his retirement, Foley was vice-president and in charge of newsprint sales and the corrugated container division. He also did public relations work for the company. The administrative services he performed there were similar to the work he performed for Suwannee. After retirement, Foley moved to Naples, Florida. Foley first learned of Suwannee in 1954 and was instrumental in persuading Dickert and Faircloth to purchase the business from Foley Industries. He endorsed the bank notes of Suwannee to assist in the purchase, and remained knowledgeable of Suwannee's business during the period 1954 through about 1960. Since 1960, he has been stockholder and director of Suwannee and has been its Vice-President since 1962. Foley's knowledge of timber markets was too general to help Suwannee in its actual purchases but he was able to provide Dickert with trends in the West Coast lumber market which, because they reflected future developments in the Florida market, provided information to Dickert faster than he would be able to otherwise obtain the information. Foley's access to the West Coast market also gave him knowledge of new developments in machinery which was *99 often introduced in the West before the South.
Foley attended directors' meetings and met with Dickert when he was on vacation in Florida, had frequent telephone conversations with Dickert, and was aware of the major aspects of Suwannee's business but not of its daily operations. He also had connections at the Atlantic National Bank of Jacksonville which were especially helpful during Suwannee's earlier years. During the years in issue, however, Suwannee did not borrow any money from that bank. The following tables, derived from Foley's income tax returns reflect the days devoted by Foley to the affairs of his various employers and his physical location during 1972 and 1973: Days Working on
Income
the Affairs of
1972
US
Can.
TOTAL
Personal
37
37
U.S. Source Income: Florida Forest
Products, Inc.
0
Suwannee Lumber
Company - Salary
$17,500 * *100 19
8
27
Brooks-Scanlon,
Inc., Director's
Fee
500
5
9
14
Canadian Source: Anglo-Canadian
Pulp & Paper
Mills, Ltd.
67,375
30
152
182
Total Days spent
in U.S. on Business
54
Total Days in Canada
on U.S. Business
17
Work Days in Year
260
1973
1973
Income
JAN-APR
MAY-DEC
U.S. Source Income: Florida Forest
Products, Inc. 5,100.00 $ 500.00
$ 4,600.00
Suwannee Lumber
Company - Salary
20,000.04
6,666.68
13,333.36
Brooks-Scanlon,
Inc. Director's
Fee
750.00
250.00
500.00
Canadian Source: Anglo-Canadian
Pulp & Paper
Mills, Ltd.
25,000.00
8,333.00
16,667.00
Jan Apr
May Dec
US
CAN.
US
CAN.
DAYS
DAYS
DAYS
DAYS
U.S. Source Income: Forida Forest
Products, Inc.
15
11
Suwannee Lumber
Company - Salary
5
1
Brooks-Scanlon,
Inc. Director's
Fee
2
3
Canadian Source: Anglo-Canadian
Pulp & Paper
Mills, Ltd.
39
44
Dickert, Faircloth, and Foley brought differing business backgrounds and talents to Suwannee. Their different areas of experience and close rapport in the conduct of Suwannee's business complemented each other in the conduct of Suwannee's business. They worked closely together over Suwannee's entire history and were a seasoned team of officers in directing and managing the business. ULTIMATE FINDINGS OF FACT 1) Suwannee's earnings and profits during each of the taxable years in question were permitted to accumulate beyond the reasonable needs of its business and Suwannee *101 was availed of to avoid the icome tax with respect to its shareholders.
2) Salary payments to Foley and Faircloth during the taxable years in question represented reasonable compensation for their respective services rendered. OPINION Issue 1: Accumulated Earnings Tax
The first issue is whether petitioner was availed of during each of the years in issue for the purpose of avoiding the income tax with respect to its shareholders, by permitting its earnings and profits to accumulate instead of being divided or distributed. Under section 533 the fact that earnings and profits have been accumulated beyond the reasonable needs of the business is determinative of the proscribed purpose unless the corporation proves to the contrary by a preponderance of the opportunity to shift the burden of proof to respondent under section 534, respondent's determination that petitioner's earnings and profits have in fact been accumulated beyond the reasonable needs of the business is presumptively correct. See Novelart Manufacturing Co. v. Commissioner,52 T.C. 794 (1969), affd. 434 F.2d 1011 (6th Cir. 1970), cert. denied 403 U.S. 918 (1971).
A determination of petitioner's reasonable business needs *102 is important in two respects. First, as already mentioned, to the extent earnings and profits have been accumulated beyond the reasonable needs of petitioner's business, the prohibited purpose of tax avoidance is presumed. Section 533. Secondly, in computing "accumulated taxable income," the base against which the tax is applied, there is a credit for the earnings and profits of the current year which are retained to meet petitioner's reasonable business needs. Section 535(c). In evaluating petitioner's alleged needs, we recognize that we are making an essentially factual determination. Estate of Goodall v. Commissioner, 391 F.2d 775, 796 (8th Cir. 1968), modifying a Memorandum Opinion of this Court, cert. denied 393 U.S. 829 (1968); Doug-Long, Inc. v. Commissioner, 72 T.C. 158 (1979); Golconda Mining Corp. v. Commissioner,58 T.C. 139, 160 (1972), reversed on another issue, 507 F.2d 594 (9th Cir. 1974); Faber Cement Block Co. v. Commissiner,50 T.C. 317, 327 (1968); Bremerton Sun Publishing Co. v. Commissioner,44 T.C. 566, 582 (1965), appeal dismissed (9th Cir. 1966). We also recognize that, in the first instance, it is the responsibility of the corporate officers and directors *103 to determine the reasonable needs of a particular business. We are consequently reluctant to substitute our judgment for that of corporate management unless we are compelled to do so by the relevant facts and circumstances. Faber Cement Block Co.,supra at 329; Bremerton Sum Publishing Co.,supra at 583; F. E. Watkins Motor Co. v. Commissioner,31 T.C. 288, 300 (1958). Once we have determined the amount of petitioner's reasonable needs for each of the years in issue, we must decide whether petitioner's earnings and profits were permitted to accumulate beyond those needs.We do not, however, merely compare the total amount needed in the business with petitioner's total accumulated earnings and profits. Rather, we look to the accumulated earnings and profits which were reflected in petitioner's net liquid assets. Ivan Allen Co. v. United States,422 U.S. 617 (1975), affg. 493 F.2d 426 (5th Cir. 1974); Smoot Sand & Gravel Corporation v. Commissioner,274 F.2d 495 (4th Cir. 1960), affg. a Memorandum Opinion of this Court, cert. denied 362 U.S. 976 (1960); Montgomery Co. v. Commissioner,54 T.C. 986, 1008 (1970); Movelart Manufacturing Co.,supra at 806; Faber Cement Block Co.,supra at 328; *104 John P. Scripps Newspapers v. Commissioner,44 T.C. 453, 467 (1965). As the Supreme Court stated in Ivan Allen Co.,supra at 628, "The question, therefore, is not how much capital of all sorts, but how much in the way of quick or liquid assets, it is reasonable to keep on hand for the business." This is consistent with our view as stated in Faber Cement Block Co.,supra at 328, that "it is the nature of the assets to which the accumulated earnings and profits are committed, rather than the mere monetary size of such accumulations, which controls." With these principles in mind, we turn to an evaluation of petitioner's alleged business needs. Normal Working Capital
Respondent's regulations indicate that working capital is a reasonable need of a business. Section 1.537-2 (b)(4), Income Tax Regs. Generally, a taxpayer's need for working capital is equal to that amount which would be sufficient to meet its operating expenses for one complete operating cycle. This amount is arrived at by determining the length of the operating cycle as a percentage of one year and by multiplying the total operating costs for one year by that percentage. Ready Paving & Construction Co. v. Commissioner,61 T.C. 826 (1974); *105 Magic Mart, Inc. v. Commissioner,51 T.C. 775 (1969); Faber Cement Block Co.,supra.
An operating cycle is the period of time it takes to convert cash into raw materials, raw materials into inventory, inventory into sales and sales into cash. [6] It can be said that an operating cycle consists of at least two separate component cycles: (1) an inventory cycle; and (2) an accounts receivable cycle. The length of the inventory cycle can be determined by dividing the number of days in one year by the number of times inventory turns over during one year. Inventory turnover can be determined by dividing the cost of goods sold for one year by either average monthly inventory or peak monthly inventory. Similarly, the length of the accounts receivable cycle can be determined by dividing the number of days in one year by the number of times accounts receivable turn over during one year. The turnover rate of accounts receivable can be determined by dividing yearly sales by either average monthly accounts receivable or peak monthly accounts receivable. Use of average or peak figures, in computing the turnover of inventory or accounts receivable, depends upon whether it is relevant to know the *106 average or the peak duration of an operating cycle. These principles were first utilized in a detailed analysis of working capital needs in Bardahl Manufacturing Corp. v. Commissioner,T.C. Memo. 1965-200. Petitioner, however, objects to the strict use of the so-called Bardahl formula in this instance. Respondent contends that use of the Bardahl formula accurately determines operating cycle needs. The Bardahl formula is by now a well-established tool and routinely applied by the courts. It is not a precise rule of law, however, but merely a rule of thumb, rising only to the level of administrative convenience. Where evidence is introduced showing the single cycle method does not accurately reflect working capital needs, the test will not be blindly applied. Dielectric Materials Co. v. Commissioner,57 T.C. 587 (1972). [7]
Petitioner *107 first asks us to use an estimated 90-day manufacturing cycle (plus a 15 percent inflation factor and 25 percent increase for expected growth in sales) to determine the inventory cycle rather than the technical time in inventory determined on the Bardahl formula basis. In the alternative, if we use the Bardahl formula, petitioner asks us to use peak inventories and the following year's adjusted inventory to calculate the inventory cycle rather than the average inventory figures for the current year used by respondent. [8]
We do not believe that use of the manufacturing cycle is appropriate in this instance. Cf. Cheyenne Newspapers, Inc. v. Commissioner,T.C. Memo. 1973-52, affd. 494 F.2d 429 (10th Cir. 1974). The amount of time a log remained at the mill before it was debarked varied (up to four weeks), as did the amount of time (30-90 days) the lumber required to be *108 air-dried. Moreover, about 15 percent of the lumber was kiln-dried instead of air-dried, a process taking only 10 days. Finally, inventory included not only pine but cypress, and the processing time for cypress is not determinable from the record. Unfortunately, therefore, it is impossible on this record to determine "sub-cycles" for the two different inventories. Thus, use of the manufacturing cycle would necessarily be only a rough estimate and one impossible to gauge in this case. On these facts, use of actual inventory figures presents a more reliable estimate of the average funds tied up in inventory than use of a 90-day cycle. We also note that respondent's calculations making strict use of the Bardahl computation show that the amount of time in inventory varied from a low of 13.38 days in 1972 to 19.60 days in 1973 and to a high of 30.84 days in 1974, indicating that 90 days is an unusual operating cycle even for pine. Nonetheless, we believe Suwannee could reasonably accumulate additional working capital to plan for the exigency of maintaining inventory beyond the average time it was carried. Because the manufacturing cycle for pine could fluctuate dramatically to as *109 much as 90 days due to conditions beyond Suwannee's control, there were instances during each year when Suwannee's cash was committed to inventory for a substantially longer period than would normally be the case. Thus, prudent business practices could call for the retention of cash or liquid assets to provide for expected disruptions in normal operations. [9] On the basis of the record, we believe a reasonable estimate of this amount would equal 20 percent of average inventory needs. But we do not believe that use of peak inventory figures rather than average inventory, as petitioner contends, is appropriate to determine inventory needs in this instance. [10] *111 Although petitioner's witnesses were generally credible and testified that peak inventory needs (during February) were 25 percent higher than year-end inventory, for the one year in the record for which inventory was broken down into monthly totals (fiscal year ending June 30, 1974), inventory on hand does not reflect seasonal increases. Cf. Atlas Tool Co. v. Commissioner,70 T.C. 86 (1978). *110 Furthermore, Suwannee was steadily increasing its inventory in order to meet expected increases in sales. This lends support to the inference that its inventory would not peak during the winter because Suwannee's inventory needs in the upcoming year would be greater than those of the previous year. We also do not agree with petitioner that we should use a subsequent year's inventory level to compute its inventory cost for a current year.Petitioner cites Empire Steel Castings, Inc. v. Commissioner,T.C. Memo. 1974-34, to support its argument that a corporation can use a subsequent year's inventory in computing working capital needs for a current year. Respondent reads the case as indicating only that the subsequent year's expenses are to be considered by the Court in determining the operating cycle for the current year but not that they should be utilized instead of the current year's operating expenses. Whether we would ever use the following year's average inventory to evaluate working capital needs for a current year is not particularly important. We do not believe it appropriate in this instance. We note simply that the record here does not provide any rational basis for using only the following year's inventory to determine a current year's needs but not the following year's cost of goods sold or accounts payable (i.e., the other elements of the Bardahl formula). Nonetheless, the steady *112 and large increase in petitioner's inventory through 1974 together with expected inflation in its costs, persuades us that petitioner would have been reasonable in maintaining working capital for increased inventory needs through 1974 beyond that allowed by respondent using average inventory. Based on the record before us, we believe that petitioner could reasonably have expected its inventory needs to increase by 30 percent in fiscal 1973 over fiscal 1972 and in fiscal 1974 over fiscal 1973. Because of the downturn in petitioner's market and general unprofitable trend in operations during fiscal 1974 and lasting through fiscal 1975, however, we do not believe it would reasonably accumulate any added working capital for inventory for fiscal 1975 over that needed for its current operations in fiscal 1974. Petitioner next seeks to adjust the formula by increasing its iperating costs by 25 percent to account for added sales, purchases, and expenses, and by an additional 15 percent to account for inflation. We agree that Suwannee reasonably assumed that its operating expenses would increase in subsequent years because of an expected increase in sales and expected future growth. In *113 view of this, Suwannee should not be restricted to a static position during any particular year and is entitled to look to the future to decide how much earnings should be retained for subsequent working capital. Upon careful consideration of the record, we believe Suwannee was entitled to accumulate capital to provide for expected increased operating expenses and costs, including those due to inflationary pressures for fiscal 1973 and 1974, of 15 percent of actual costs for the respective preceding years (i.e., 1972 and 1973, respectively). For the same reasons we noted in our discussion of inventory needs, however, we do not believe any additional working capital would reasonably be accumulated during the 1974 fiscal year to provide for fiscal 1975. Respondent argues that notwithstanding the expected increases due to inflation in Suwannee's operating costs, because Suwannee could expect to pass on the costs in higher prices, no adjustment should be made. This argument misses the point. Although by increasing revenues to match increased costs a company may protect its profit margin, it simply does not follow that increased capital is not required to cover the added costs, at least *114 initially. In other words, any increased revenues would tend to lag behind the increased costs. [11] Moreover, it is not clear that Suwannee would be able to pass on all its higher costs. Petitioner next contends that it should be given credit for estimated corporate income taxes as an operating cost in calculating the inventory cycle. We have previously agreed with this position. Doug-Long v. Commissioner,supra;Empire Steel Castings, Inc. v. Commissioner,T.C. Memo. 1974-34. [12] *115 As we noted in those cases, since a taxpayer is required to pay estimated taxes during the year, this item represents an operating expense which should be reflected in the Bardahl computation. A final dispute between petitioner and respondent must be resolved before the inventory cycle question can be finally determined. Both parties agree that cost of goods sold (COGS) and other relevant operating costs (less depreciation) should be used to determine operating costs in the inventory turnover. Respondent arrives at this amount by adding to the COGS as shown on Suwannee's tax returns the total deductions shown on line 27, Form 1120, and subtracting depreciation, contributions, and pension and profit sharing payments. Petitioner in its calculations does not subtract contributions and pension and profit sharing payments. We are aware that at least one other case, without discussion of this point, accepts respondent's method. Kingsbury Investments, Inc. v. Commissioner,T.C. Memo. 1969-205. The objective of this computation is to determine the amount of cash needed to finance petitioner's activities during an operating cycle and it is for that reason that depreciation, a noncash item, is not included *116 within total operating costs. Although we agree that pension and profit-sharing contributions represent indirect operating expenses incurred on behalf of labor incident to production, the plan need not be funded until two and one-half months after the close of the year, section 404(a)(6), and the amount of contributions to a profit-sharing plan need not be determined until year's end and can be eliminated entirely as an expense. Similarly, we do not believe that charitable contributions should be included as operating expenses in the operating cycle. Nonetheless, we do not believe that these amounts, at least to the extent allowable as deductions, should be treated as funds available for dividends. Both profit-sharing plan and charitable contributions represent legitimate business expenditures, and we therefore reduce available working capital by these amounts. [13] *118 Petitioner next objects to use of the credit cycle on its purchase to offset its working capital needs.The cases in the area are somewhat inconsistent, some cases having applied a credit cycle [14] *119 while others have not. [15] In our opinion, the availability of credit is a relevant factor in determining the working capital *117 needs that a prudent businessman would consider in most instances, since to the extent that payment of expenses ordinarily may be postponed as a result of credit arrangements, the need for operating capital is reduced. Cataphote Corp. of Mississippi v. United States,210 Ct.Cl. 125, 535 F.2d 1225, 1234 (1976); C. E. Hooper Inc. v. United States,210 Ct. Cl. 615, 539 F.2d 1276 (1976); Smoot Sand & Gravel Corp. v. Commissioner,241 F.2d 197 (4th Cir. 1957), cert. denied 354 U.S. 922 (1957); Atlas Tool Co. v. Commissioner, supra.[16] But cf. Central Motor Co. v. United States,583 F.2d 470 (10th Cir. 1978). Petitioner contends that use of a payable cycle would require it, in effect, to borrow to pay dividends. Petitioner's argument, while not entirely clear, is apparently to the effect that payables free other assets (otherwise needed to purchase inventory) *120 which then become available to pay dividends and, to that extent, borrowed capital is being used to pay dividends. Although superficially plausible, petitioner's argument misses the point. What the Bardahl formula measures is the amount of funds tied up in the operating cycle. To the extent funds are not tied up, they are free to be put to other use. If a business shows that "available" funds must be kept in reserve for a legitimate business purpose such funds are not unreasonably accumulated. But a business would not reasonably accumulate funds freed for use because of its purchasing on credit, at least to the extent such purchases are part of its normal course of doing business. The question is simply whether a business should retain previously accumulated capital to provide for current operating needs. [17] *121 In the alternative, petitioner argues that if a credit cycle is relevant, respondent incorrectly determined the appropriate amount in his Bardahl computation. Respondent determined the accounts payable cycle by dividing COGS and other operating costs by the average of all current liabilities. It is petitioner's position that only material costs are subject to trade account treatment because its other operating costs, such as wages, are paid on a recurring cash basis and thus the only pertinent item is the funds tied up in materials. Therefore, only the annual costs in materials should be used in the computation, and other payables such as income taxes due or dividends payable should not be included in the average payables. We believe that petitioner is basically correct in this point. Use of COGS and other relevant operating costs divided by the average accounts payable to determine the trade payables turnover is reflected in several cases. [18] Other cases have computed the turnover using materials purchased divided by average trade payables. [19] We are aware of no cases, however, which use total current liabilities, rather than trade *122 payables, to determine the relevant cycle. Nor do we believe that this method provides a reasonable estimate of the credit cycle. As noted previously, the operating cycle is adjusted to reflect the reduced need for working capital to the extent that payment of operating expenses may be postponed as a result of credit arrangements with suppliers. We fail to see how other current liabilities would affect this cycle, and we believe that the credit cycle should in this instance be computed by dividing the materials purchased by the average trade payables, as reflected on Suwannee's balance sheets. On the basis of the foregoing discussion and holdings, we can now compute petitioner's working capital needs: Years Ended: 6/72
6/73
[20] *124 (1) Average Inventory $112,733
$175,198
(2) Avg. Inventory+50%
(20%+30% adjustments)
169,099
262,797
(3) COGS and other
relevant operat-
ing costs (includ-
ing estimated taxes
paid)
3,119,739
3,281,340
(4) Line (3)+15%
3,587,699
3,773,541
(5) Inventory cycle
in days 365 /
17.21
25.42
(line 4./.line 2)
[21] (6) Average Accounts receivable
172,956
206,150
(7) Net Sales
3,293,631
4,096,088
(8) Accounts Receiv-
able Cycle in
Days 365 /
(line 7./.line 6)
19.17
18.37
(9) Average Trade
Payables
53,587
64,040
(10) Materials Pur-
chased
1,696,180
1,868,330
(11) Credit Cycle in
days 365 /
11.53
12.51
(line 10./.line 9)
(12) Total Operating
Cycle (line 5+
line 8-line 11)
24.85
31.28
(13) Operating Cycle
as percent of year
(line 12./.365)
.068
.086
(14) Current Operating
Needs (line 4Xline
13)
$243,963
$324,524
*123 6/74
[20] (1) Average Inventory $305,945
(2) Avg. Inventory+50%
(20%+30% adjustments)
367,134 (+20%
only)
(3) COGS and other
relevant operat-
ing costs (includ-
ing estimated taxes
paid)
3,768,609
(4) Line (3)+15%
3,768,609 (15% in-
crease not
(5) Inventory cycle
applicable)
in days 365 /
35.57
(line 4./.line 2)
[21] (6) Average Accounts Receivable
213,297
(7) Net Sales
3,909,904
(8) Accounts Receiv-
able Cycle in
Days 365 /
(line 7./.line 6)
19.91
(9) Average Trade
Payables
80,186
(10) Materials Pur-
chased
2,184,529
(11) Credit Cycle in
days 365 /
13.39
(line 10./.line 9)
(12) Total Operating
Cycle (line 5+
line 8-line 11)
42.09
(13) Operating Cycle
as percent of year
(line 12./.365)
.115
(14) Current Operating
Needs (line 4Xline
13)
$433,390
Current Assets and Liabilities
Petitioner and respondent are also at odds over Suwannee's amount of current assets and current liabilities. The difference in current liabilities is attributable to petitioner's inclusion of the $10,000 current portion of the Barber *125 note as a current liability which respondent ignores in his computation. We agree with petitioner that the portion of the note payable within the next year should properly be reflected as a current liability. Motor Fuel Carriers, Inc. v. United States,322 F.2d 576, 579 (5th Cir. 1963), and we include it within the totals reflected in our Findings of Fact. As of the end of its fiscal years 1972, 1973, and 1974, Suwannee's current liabilities were as follows: 6/30/72
6/30/73
6/30/74
Accounts payable
64,785
63,295
97,077
Current portion of Barber note
10,000
10,000
Accrued expenses
40,320
22,799
30,554
Federal income taxes payable
30,312
341,558
Accrual/profit sharing plan
32,364
34,960
41,200
State income taxes payable
4,354
37,304
Cash dividends payable
19,110
Total current liabilities
$172,135 $ 529,026
$ 178,831
Respondent, using Suwannee's books, determined it had the following current assets: 6-30-72
6-30-73
Deposit on Land & Timber
1,500.00
Income Tax Refund
Receivable
Customers Accounts Rec.
144,286.14
140,655.61
Loggers Accounts Receivable
Affiliates Accounts Rec.
37,991.04
89,367.09
Forest Sales Corporation -
Notes Rec. on Demand
250,000.00
250,000.00
Forest Sales Accrued
Interest Receivable
1,458.33
1,458.33
[22] Granthan Note Receivable 3,017.50
3,017.50
Applied Management
Science Note Receivable
Entertainment Media -
Note Receivable
Accrued Interest
Receivable
Cash Value of Life
Insurance
39,105.47
43,549.59
Employee Credit Fund
1,500.00
1,500.00
Lumber - Inventory
110,379.69
209,642.80
Logs - Inventory
9,680.31
10,190.00
Gas - Inventory
1,659.01
2,645.74
Supplies - Inventory
3,100.00
3,100.00
Standing Timber
Inventory
70,000.00
Prepaid Insurance
15,759.52
14,843.02
Prepaid Occupational
[23] Licenses 37.50
37.50
Cash
222,251.67
850,636.46
Total
841,726.18
1,690,643.64
6-30-74
Deposit on Land & Timber
5,000.00
Income Tax Refund
Receivable
32,708.37
Customers Accounts Rec.
152,403.23
Loggers Accounts Receivable
24,651.90
Affiliates Accounts Rec.
19,515.90
Forest Sales Corporation -
Notes Rec. on Demand
0
Forest Sales Accrued
Interest Receivable
0
[22] Granthan Note Receivable 3,030.00
Applied Management
Science Note Receivable
40,000.00
Entertainment Media -
Note Receivable
100,000.00
Accrued Interest
Receivable
11,661.78
Cash Value of Life
Insurance
48,740.44
Employee Credit Fund
1,500.00
Lumber - Inventory
336,100.00
Logs - Inventory
39,968.00
Gas - Inventory
7,144.96
Supplies - Inventory
3,100.00
Standing Timber
Inventory
23,659.25
Prepaid Insurance
18,020.85
Prepaid Occupational
[23] Licenses 37.50
Cash
723,189.39
Total
1,590,431.57
*126 Petitioner arrives at different amounts because it excludes from current assets the following: 6/30/72
6/30/73
6/30/74
Forest Sales Corp. -
Notes Rec.
$250,000.00
$250,000.00
Forest Sales Accrued
Interest Receivable
1,458.33
1,458.33
Cash Value of Life
Insurance
39,105.49
43,549.59
48,740.44
Employee Credit Fund
1,500.00
1,500.00
1,500.00
Applied Management Note
40,000.00
Entertainment Media
Note
100,000.00
Deposit on Land &
Timber
1,500.00
5,000.00
Standing Timber
Inventory
70,000.00
23,659.25
Total Reduction
$293,563.82
$366,507.92
$218,899.69
Petitioner's Compu-
tation of Current
[24] Assets $548,422.00
$1,324,395.00
1,371,778.38
Cenerally, a current asset includes items representing *127 the equivalent of cash. [25] Nonetheless, not all assets readily convertible into cash should be considered a current asset, because of the tendency of creditors to rely more upon the ability of debtors to pay their obligations out of the proceeds of current operations and less upon the debtor's ability to pay in cash on liquidation. For example, an asset used to fund a fixed liability is not considered a current asset, John P. Scripps Newspapers v. Commissioner,supra, at 472; stock owned by a corporation in another company to insure an adequate supply would also not be a current asset. Bremerton Sun Publishing Co. v. Commissioner,44 T.C. 566, 587 (1965). This is in line with the definition promulgated by the American Institute of Certified Public Accountants (hereafter AICPA) which excludes from the definition of current assets "investments in securities (whether marketable or not) or advances which have been made for the purpose of control, affiliation, or other continuing business advantage." AICPA Accounting Research Bulletin No. 43, as amended by APB Opinion No. 21. During the years in question Forest Sales *128 was responsible for between 20 and 29 percent of Suwannee's sales and was important to its sales outside Florida. To demand payment would have required Forest Sales to reduce its sales since the loans were made to permit Forest Sales to carry increased receivables. Forest Sales relied upon the lumber manufacturers, including Suwannee, for loans because its bank would not advance sufficient capital. Section 1.537-2(b)(5), Income Tax Regs., provides that loans to suppliers or customers if necessary to maintain business are a reasonable need of the business. We believe on these facts that the Forest Sales note should not be considered a current asset because it would have been unreasonable for Suwannee to demand payment. [26]
Notwithstanding this, respondent contends that the loan falls under the purview of section 1.537-2(c)(3) which states that it would be unreasonable to provide "loans to another corporation, the business of which is not that *129 of the taxpayer corporation, if the capital stock of such other corporation is owned, directly or indirectly, by the shareholder or shareholders of the taxpayer corporation and such shareholder or shareholders are in control of both corporations." Factories Investment Corp. v. Commissioner,39 T.C. 908 (1963), affd. 328 F.2d 781 (2nd Cir. 1964); Latchis Theatres of Keene, Inc. v. Commissioner,19 T.C. 1054 (1953), affd. 214 F.2d 834 (1st Cir. 1954). Respondent argues that because George Dickert and his brother exercised either direct or indirect control of both Forest Sales and Suwannee the note should be considered available for Suwannee's current needs. During the years in issue, George Dickert owned 34.63 percent of petitioner and his son owned an additional 3.93 percent. The remaining stock in petitioner was owned by Faircloth and M. J. Foley, both unrelated to Dickert and both of whom were on petitioner's board of directors. George Dickert and his brother during the years in issue each owned 25 percent of Forest Sales. The two remaining shareholders of Forest Sales, one of whom owned 30 percent and one 20 percent, were unrelated to Dickert or the other shareholders of petitioner. *130 Based upon the foregoing, we cannot say that petitioner and Forest Sales were controlled by the same shareholders, even assuming Forest Sales is not in the same business as petitioner. Accordingly, we conclude that the Forest Sales note receivable and related accrued interest should not be included in current assets. We now deal with the Applied Management and Entertainment Media notes. These notes represent advances or an investment in corporations wholly unrelated to petitioner's business. We do not believe petitioner has shown that it invested in these businesses in an attempt to diversify into a second active business or that it would have been capable of managing either of those businesses. Atlantic Commerce & Shipping Co. v. Commissioner,500 F.2d 937 (2nd Cir. 1974), affg. T.C. Memo. 1973-106. Thus, we believe these investments were nothing more than an attempt to put excess available capital to use. Moreover, because an investment of earnings and profits in assets as a source of passive income having no relation with the taxpayer's business indicates an intent to avoid shareholders' taxes, sections 1.533-1(a)(2)(ii) and 1.537-2(c)(4), Income Tax Regs., we believe that *131 these items should be treated as if they were current assets in determining working capital available for distribution, even if they are nonliquid. [27]
Cf. Golconda Mining Corporation v. Commissioner,supra.
Turning next to the question of the cash value of life insurance policies, we note initially that such is excluded from the definition of a current asset for accounting purposes.AICPA Accounting Research Bulletin No. 43. Although accounting principles are not conclusive for tax purposes, Thor Power Tool Co. v. Commissioner,435 U.S. 914 (1979); Frank Lyon Co. v. United States,435 U.S. 561 (1978) we agree that the cash surrender value of the life insurance policies was not reasonably available for Suwannee's current operating needs and should not be considered a current asset. [28] *132 Life insurance policies having cash values represent no more than an asset which could serve as collateral for borrowing. Any such borrowing, although it would produce liquid cash, would technically be offset by a corresponding current liability. Respondent included standing timber on the Barber tract as a current asset. At the time of purchase, the timber on the land was ready for immediate harvesting and in fact was cut in fall 1974. Nonetheless, the trees could be left standing for a number of years before harvesting, depending on petitioner's needs, and we are reluctant to consider a natural resource such as timber a current asset. The timber is not reflected in petitioner's inventory to determine its cost of goods sold until it is cut. In addition, standing timber is subject to a depletion allowance at the time it is cut. Section 611. We also note that natural resources are excluded from the definition of current assets for accounting purposes. AICPA Accounting Research Bulletin No. 43. The two remaining items in dispute are the employee credit fund and deposits on land and timber. Petitioner contends that because the credit fund remained unchanged at $1,500 every year, it is an ongoing business need and, therefore, is not a current asset. However, the fact that an asset is funded *133 in a prior year and remains on the books is irrelevant to a consideration of whether it is a current asset. For example, petitioner's accounts receivable at year end for the years 6/30/71 - 6/30/76 never fall below $163,000 but it is clear that all receivables are current assets, not only those above $163,000. We conclude that the employee credit fund must be considered a current asset.
With respect to the deposits on land, the record is silent as to any of the conditions or terms of the deposits. It is impossible to determine, therefore, whether the deposits will be received or applied against the total purchase price of the land and timber or whether the timber was to be currently used. Since the burden of proof is on petitioner, we can only conclude that the deposits were current assets (although we note that cash which is designated for expenditures to acquire noncurrent assets would not generally be considered a current asset). Based upon the foregoing, we find that Suwannee had current assets at June 30, 1972 of $551,162.38; at June 30, 1973 of $1,325,635.72; and, at June 30, 1974 of $1,518,031.88. Subtracting from these amounts Suwannee's current liabilities, we arrive *134 at Suwannee's available working capital: $379,027.38 at June 30, 1972; $796,609.72 at June 30, 1973; and $1,339,200.88 at June 30, 1974. Reasonably Anticipated Future Needs
We turn now to petitioner's alleged business needs other than working capital for its regular operations. As stated in section 1.537-1(b)(1), Income Tax Regs: In order for a corporation to justify an accumulation of earnings and profits for reasonably anticipated future needs, there must be an indication that the future needs of the business require such accumulation, and the corporation must have specific, definite, and feasible plans for the use of such accumulation. Such an accumulation need not be used immediately, nor must the plans for its use be consummated within a short period after the close of the taxable year, provided that such accumulation will be used within a reasonable time, depending upon all the facts and circumstances relating to the future needs of the business. Where the future needs of the business are uncertain or vague, where the plans for the future use of an accumulation are not specific, definite, and feasible, or where the execution of such plan is postponed indefinitely, an accumulation *135 cannot be justified on the grounds of reasonably anticipated needs of the business. We must, therefore, look at the nature of the steps taken by Suwannee towards realization of its expansion to determine whether it had a definite plan. Motor Fuel Carriers, Inc. v. Commissioner,559 F.2d 1348 (5th Cir. 1977). See also Van Hummell, Inc. v. Commissioner,364 F.2d 746 (10th Cir. 1966), affg. T.C. Memo. 1964-290, cert. denied 386 U.S. 956 (1967) ("Some clear action * * * [to] include the adoption of specific plans or programs"); Smoot Sand & Gravel Corp. v. Commissioner,supra, at 202 ("some contemporaneous course of conduct directed toward the claimed purpose"); Doug-Long, Inc. v. Commissioner,supra;Estate of Lucas v. Commissioner,supra.
Before examining petitioner's claimed business needs, however, we believe it is necessary to comment on respondent's repeated objections to the consideration of any events occurring after the years in issue. Section 1.537-1(b)(2), Income Tax Regs. states, in part, that subsequent events may be considered to deterine whether the taxpayer actually intended to consummate the plans for which earnings and profits were accumulated. Of course, evidence *136 of what a taxpayer did in subsequent years is not controlling, but it certainly affects the weight to be given its declared intention during the years in issue. JJJ Corp. v. United States, 217 Ct. Cl.    , 576 F.2d 327 (1978); Faber Cement Block Co. v. Commissioner,supra, at 333. Moreover, because a particular project has not been undertaken or completed during the years in issue is not conclusive as to the definiteness of the plan. Timber Supply
Petitioner maintains that it accumulated $500,000 for the acquisition of timber and land to provide for its long-term needs. Respondent contends that such a plan would not have been feasible or necessary, and, moreover, that the evidence does not establish when and if a reserve had been set up or the amount of such a reserve. A careful examination of the record persuades us that Suwannee's timber supply problem was not as desperate as Suwannee would have us believe. Suwannee obtained 60 percent of its timber from large paper companies. Buckeye's rotation program ended and other paper companies' rotation periods were well-advanced in the mid-1970's, and thus, available timber from large portions of land in the area was declining. Nonetheless, *137 saw timber on Buckeye's "marginal" land (as well as on land of other paper companies) continued to be made available to Suwannee. In addition, the paper companies relied on the sawmill operators for chips and could reasonably be expected to continue to trade saw timber to the sawmills for chips. Suwannee had good relations with independent suppliers and could probably rely on most of them as it had in the past, although there is no doubt that the increased competition would lead to higher prices. The $500,000 in question would not purchase enough land and timber to provide Suwannee with an adquate supply of timber to provide for its long-term needs, since a $500,000 reserve would supply Suwannee with enough timber for only 10 weeks. Moreover, judging by Suwannee's yearly timber needs, its inability to outbid large companies on large tracts, and the actual cost of buying enough land to provide for needs on a long-term basis, we do not believe Suwannee could reasonably expect to purchase enough land to ensure it with a stable long-term supply. Cf. Capital Sales, Inc. v. Commissioner,71 T.C. 416 (1978). Moreover, we assume that many of the small tracts on which Suwannee bid (but *138 lost) were to provide for its current needs. But this does not mean that Suwannee would have been unreasonable to purchase land to provide for short-term needs which might arise in the future in the event that the paper companies temporarily stopped selling to Suwannee (as happened) or that Suwannee was unable to purchase timber from independent landowners for its short-term needs. Support for this may be found in Suwannee's purchase of the Barber tract which, although only a relatively small tract, was purchased because it could provide Suwannee with what essentially must be viewed as a reserve to be used when Suwannee had a shortage of supply (due to high prices or because it was cut off). We do not believe that it would have been unreasonable for Suwannee to set aside $500,000 of funds for this purpose.Cf. Doug-Long Inc. v. Commissioner, supra,William C. Atwater & Co. v. Commissioner,10 T.C. 218 (1948); L. R. Teeple Co. v. Commissioner,47 B.T.A. 270 (1942). [29]
Although it is true that it is not always possible for a company in advance to set aside a specific sum to achieve a specific goal, John P. Scripps Newspapers v. Commissioner,supra, *139 we are nonetheless troubled by the general lack of evidence supporting the amount of reserve and when the reserve, if any, was actually adopted. The November 1972 minutes first reflect the $500,000 amount but there is little additional evidence which supports this amount, other than the trial testimony, which at times was conflicting, as to when the figure was arrived at and the precise purpose for which the timber was to be put. For example, Dickert testified that the November 1972 minutes mark "approximately the time that we [Suwannee] began to figure strongly about the necessity of what we saw in the future about our timber supply, we just had to get to work * * *". Foley, however, testified that Suwannee always wanted to have ample funds to buy timber or timberland in the event it was offered for sale. Additionally, later minutes generally do not reflect the $500,000 amount and we believe that petitioner has utilized this figure more in hindsight than as a firm plan to spend such amount on timberland. Moreover, in view of Suwannee's desire to expand, its purchase of F.F.P., and other drains on its working capital, we do not believe petitioner has shown that it actually had *140 a definite plan to acquire a reserve of timber on land requiring outlays of $500,000 in cash. It appears that Suwannee actually purchased only one tract of land during the years in issue for this purpose (the Barber tract for $130,000, which required only $30,000 in cash down payment). In addition, Suwannee apparently purchased only an additional $156,000 of reserve timber and land through June 30, 1976 (the Starke tract in December 1974, requiring cash down payment of only $45,293). Although Suwannee may have been willing to pay cash, it issued long-term notes covering the major portions of its purchases, as was customary in purchasing property in the area. The lack of significant actual land and timber purchases, as well as the other alleged needs for working capital, weigh against the definiteness of Suwannee's plans to make $500,000 of such purchases. Unfortunately, petitioner seems to equate a recognized need with a specific plan for meeting it. Both must be shown. Estate of Lucas v. Commissioner, supra.Atlantic Properties, Inc. v. Commissioner,62 T.C. 644, 658 (1974), affd. 519 F.2d 1233 (1st Cir. 1975). We hold that petitioner has not shown that it had a definite plan *141 to purchase any amount of timber for reserves. Petitioner relies on Defiance Lumber Company v. Commissioner, a Memorandum Opinion of this Court, dated July 8, 1953, in which we held that the fact that petitioner was not actually able to secure greatly enlarged supplies of logs and timber in a declining log market with mounting competition did not evidence an intent to accumulate earnings, and the market justified a conservative dividend policy. Suffice it to say each case is necessarily a factual one, and we were convinced in that case that the taxpayer had a definite plan to acquire logs and timber in the amount claimed. Plant Replacement and Modernization
Suwannee's physical plant was antiquated, noncompetitive, and in need of major renovation. However, we again have a situation in which there is a recognized need but no showing by Suwannee that it had a definite plan to meet it. In June 1973, Suwannee sent 12 of its employees to Atlanta to inspect new machinery, and the corporate minutes of June 2, 1973, state that plans should be made to replace Suwannee's machinery. (emphasis added) This is insufficient to meet Suwannee's burden of proof, for it is not sufficient that the *142 taxpayer recognize a future problem and discuss possible and alternative solutions. Definiteness of plan coupled with action taken towards its consummation are essential. Dixie, Inc. v. Commissioner,277 F.2d 526, 528 (2d Cir. 1960), affg. 31 T.C. 415 (1959), cert. den. 364 U.S. 827 (1960). Testimony given by George Dickert reinforces this conclusion: Q Was -- did the company have a plan to modernize its equipment? A Yes, we had a plan. It was no formal plan. Q Was it a long range plan? A It was a long range plan, yes, sir. Q What -- have you made any calculations -- have you made any calculations or estimates of what it would take for the company to make -- to install competitive machinery and to make it less labor intensive? A Yes, I made some studies on it. Q What were your conclusions, Mr. Dickert? A I was reasonably sure in my planning it, I could get a fairly efficient -- not the most efficient mill, with an expenditure between $500,000.00 and $1,000,000.00. Q But as stated, that was more of a long range plan for the company. A That's right. Q Just corporate recognition that this was an inadequate facility, is that correct? A That's right. Petitioner contends *143 that $1,000,000 was needed for modernization, but because timber supply was a more important immediate need no short-term plans were under active consideration; the long-term goal of Suwannee was to rebuild its plant. We agree that the mere fact that a lengthy period may elapse before the plans are put into effect does not necessarily mean the plans were indefinite. Magic Mart, Inc. v. Commissioner,supra, at 796-797. However, modernization and replacement of equipment could presumably be achieved in stages and there was no indication that any definite plans were ever formulated and only gross estimates as to cost were made. While we are aware that because other projects may have been more important to Suwannee, the ultimate importance of modernization is not negated, [30] in view of Suwannee's loans in fiscal 1974 to Entertainment Media, ($100,000) and Applied Management ($40,000), and loans to F.F.P. in fiscal 1975 of $350,000, we find it hard to believe that the timber supply problem was the only reason for delaying implementation. We believe that plans, if any, for modernization were, therefore, postponed indefinitely and fall outside Suwannee's reasonably anticipated needs. *144 Sec. 1.537-1(b)(1), Income Tax Regs.
Reserve for Fire
Petitioner maintains that it is entitled to a 3 month operating expense reserve (to cover the time necessary for rebuilding) plus a $200,000 reserve for expenses to ensure itself against a fire to its finishing plant (planer mill). Petitioner's insurance covered 80 percent of the cost of rebuilding its facilities but it carried no business interruption insurance. Petitioner claims that as a matter of corporate policy it would have attempted to continue operation of its sawmill and chip mill, retain its labor force, and maintain its relations with its suppliers. There is no evidence in the record to support petitioner's claim that it intended to segregate or hold any portion of its current assets as a reserve for fire damage. Moreover, we have doubts as to the feasibility of its maintaining operations in the event a fire destroyed the entire mill, an event which is itself an unlikely possibility. As aptly stated in Hardin v. United States,461 F.2d 865, 871 (5th Cir. 1972), a corporation cannot retain earnings "for the purpose of providing for some theoretical *145 contingency that might never have transpired. Bare possibilities do not amount to reasonable business needs." Here, petitioner has established at best only that such reserves might have been necessitated in the event of some hypothetical disaster. See also section 1.537-2(c)(5), Income Tax Regs. ("unrealistic hazards"). Increased Inventory
In view of our inclusion in the Bardahl formula of a 30 percent increase in average inventory and a 15 percent increase in cost of operations for fiscal 1972 and 1973, we have adequately accounted for any expected increases in inventory for those years. Since we do not believe that petitioner had a plan to stockpile inventory in excess of that required for its normal operating cycle needs, adding an additional reserve would, therefore, duplicate those amounts. Increased Receivables
Initially, we note that receivables declined in fiscal 1974 from fiscal 1973 and receipts from customers showed a decline in fiscal 1973 from fiscal 1972 and only a small increase in fiscal 1974. Moreover, any increase in receivables would have to be balanced at least in part by an increase in expected payables due to increased purchases, as respondent contends. *146 We have, however, accounted for the increases in both receivables and payables in the Bardahl computation because we have increased the cost of operations in the computation for 1972 and 1973 by 15 percent. In so doing, we have increased the amount of both receivables and payables tied up in the operating cycle by 15 percent, since the amount of assets tied up in those items is a function of the amount of assets tied up in cost of goods sold. We have not allowed any increase in receivables or payables in fiscal 1974, however, for the same reasons we did not allow an increase in expenses for 1974 in our Bardahl computation. F.F.P. Needs
Section 1.537-3(b), Income Tax Regs., states that a controlled subsidiary may be considered an extension of the parent's business. If so, and the subsidiary's own resources are insufficient to provide for its needs, then the parent may accumulate earnings for the needs of its subsidiary. Meads Bakery, Inc. v. Commissioner,364 F.2d 101 (5th Cir. 1966), revg. T.C. Memo. 1964-104; Montgomery Co. v. Commissioner,54 T.C. 986 (1970). We do not believe that any accumulations for F.F.P. would be reasonable prior to the July 13, 1973 meeting between Suwannee *147 and F.F.P. Prior to this time, the F.F.&M. shareholders expressed no interest in a sale to Suwannee, and it is not clear when the shareholders first expressed any interest in a merger. At the meeting no final decision was made to merge, although both companies reached the conclusion that since F.F.P. was engaged in a business related to Suwannee's, a merger would benefit both companies. Not until November 1973 was an accountant hired to study the two companies' balance sheets as a basis for negotiations. The prospects for merger were quite good during late 1973, however, and negotiations continued through April 1974, as terms were worked out. The merger was in fact consummated in July 1974. On these facts, we believe it would have been reasonable for Suwannee to accumulate profits during fiscal year 1974 to provide for F.F.P.'s reasonable needs to the extent that F.F.P. could not. [31]
In this regard, petitioner contends that it needed to provide for F.F.P.'s operating needs, expansion needs, and to retire F.F.P.'s debts. Petitioner *148 presents a Bardahl computation to show that F.F.P. had a deficit in its current operating cycle needs during F.F.P.'s 1973 and 1974 fiscal years. To compute the cycle, petitioner used inventory, accounts receivable, and available working capital at the prior year's end, but did not use a credit cycle. [32] *149 In our computation, we use average receivables, average inventory, and a credit cycle and arrive at working capital needs of $89,364 for its fiscal year 1973 and $224,189 [33] for its fiscal year 1974. F.F.P.'s current assets less current liabilities were $171,727 at March 31, 1973, and $133,841 at March 31, 1974. [34] Thus, for the fiscal year ended March 31, 1974, F.F.P. had a shortage of working capital in the amount of $90,348 ($224,189 less $133,841), for which Suwannee could reasonably accumulate earnings during fiscal 1974. We note that petitioner loaned F.F.P. $60,000 for working capital in July 1974. The areas into which F.F.P. plainned to expand were not set, although between 1971 and 1974 three new facilities were purchased and others expanded. F.F.P. hoped to expand at a rate of one new facility a year, but the plans were neither specific nor definite and seem instead to reflect only a corporate desire to expand as fast as feasible. Cf. Faber Cement Block Co. v. Commissioner,supra, at 333. [35] Therefore, although petitioner did, in fact, loan F.F.P. money to expand, we hold that under the circumstances F.F.P.'s ill-defined expansion plans cannot be considered a basis for Suwannee's accumulation of earnings.
F.F.P. had debt outstanding which petitioner expected to retire (in part) in order to improve F.F.P.'s financial position. This retirement of debt *150 would be a reasonable business need. Sec. 1.537-2(b)(3), Income Tax Regs.Suwannee loaned F.F.P. an additional $250,000 during its 1975 fiscal year to retire some debt and guaranteed $200,000 of F.F.P.'s obligations to secure F.F.P. a line of credit. Accordingly, based upon all of the foregoing including working capital needs, we conclude that Suwannee could have accumulated $200,000 during fiscal 1974 to provide for F.F.P.'s reasonable needs. Florida Income Taxes
Petitioner concedes that the Florida corporate income tax is included as an expense in the operating cycle but argues that the operating cycle represents only a partial recovery of the tax. In Cheyenne Newspapers, Inc. v. Commissioner,494 F.2d 429 (10th Cir. 1974), affg. T.C. Memo. 1973-52, the taxpayer argued that federal income tax payments should be considered both a reasonably anticipated business expense and a current expense. As noted by the Tenth Circuit, the result of this would be a double reduction in income taxes to justify accumulated earnings. While it is true that a Bardahl computation was not used to determine the taxpayer's needs in that case, we believe the same rationale applies. Fence Post Production *151 The evidence adequately shows that Suwannee considered diversifying into fence post production, and in May 1975, Suwannee purchased a post peeler for use in the venture. Thus, we must determine when a definite and specific plan to purchase the peeler and begin production was formulated.Dickert's preliminary study of the project's feasibility was commenced in July 1973; his son made a study of machinery used to peel bark from timber and rendered a written report recommending that Suwannee go into post production. We believe these facts show that diversification into fence post production was under serious and active consideration during Suwannee's fiscal 1974 year but that there is insufficient evidence to support petitioner's contention that plans were actively considered prior to July 1973. However, the exact machine Suwannee purchased may not have been decided on prior to the July 10 report. Suwannee was actively examining alternatives, and under the circumstances the fact that the exact machine was not then determined has little significance. Faber Cement Block Co. v. Commissioner,supra, at 332-333. Accordingly, we hold that Suwannee reasonably accumulated $100,000 in fiscal *152 1974 to provide for its entry into fence post production. Montgomery Blow Hog, Second Treating Cylinder, Riderless Carriage
As to these items, all placed into service during or just prior to Suwannee's 1973 fiscal year, we do not believe any accumulations were required as of June 30, 1972. First, those costs, apart from the actual capital expenditure required to purchase the items, which are attributable to increased labor or inventory would be already considered in the Bardahl computation. This is so because these expenses were incurred due to Suwannee's increasing business rather than starting a new line (such as the fence post production), and would be part of its operating expenses. To allow for increased inventory and operating expenses expected in fiscal 1973, we increased the former by 30 percent and the later by 15 percent and to allow additional costs here would be duplicative. Moreover, these items represent fairly small expenditures which could be easily financed through Suwannee's day-to-day operations. There is no evidence of any planned acquisition for any of the items, aside from Dickert's testimony that he anticipated purchasing the riderless carriage as of June *153 1972. This falls far short of petitioner's burden of establishing that it had a definite and specific plan as of June 30, 1972 to purchase these items and that it needed to accumulate assets. Acquisition of Transportation Equipment from George Dickert
We agree with respondent that Suwannee could not reasonably anticipate purchasing trucks (which it purchased in 1975) from George Dickert, Inc., during the years in issue. Since Dickert (who controlled George Dickert, Inc.) was Suwannee's president and had consistently refused to sell to Suwannee, despite the urging of other shareholders, we find it hard to believe that Suwannee had a definite plan to purchase the trucks. Cf. Myron's Enterprises v. United States,548 F.2d 331 (9th Cir. 1977). New Retail Store and Office Building
Respondent contends that because there were no plans to build either a retail store or new office building until a new lease was obtained, there could be no reason to accumulate to provide for such needs until the lease was signed (March 1975). We believe this argument begs the question. Although Suwannee would not begin construction until the lease was signed, this does not necessarily mean it should not *154 have retained assets to provide for the buildings prior to that time. If Suwannee reasonably anticipated the lease would be renewed with favorable terms and had definite plans to build upon renewal, then it would not have been unreasonable for it to maintain capital for this purpose. We believe Suwannee planned to build upon renewal, and respondent does not seriously contend otherwise. In fact, within a year after the lease was signed construction began. On the facts here, we hold that it was reasonable for Suwannee to maintain the $50,000 funds necessary to construct the office building during all the years in issue. Suwannee became concerned over the lease in 1972 and negotiations on the lease began sometime in 1973 and lasted until March 1975. However, it does not appear that Suwannee had any serious doubts that the lease would be renewed on terms that were sufficiently favorable to it. Simply bcause Suwannee could not predict exactly when the terms would be worked out does not make otherwise definite plans indefinite, since renewal could be expected to be consummated within the foreseeably near future. Magic Mart, Inc. v. Commissioner,supra, at 796-797.
It was not until *155 1972 and 1973 that Dickert made a study of the retail store's potential profitability, however, and plans to construct it were not discussed with Foley and Faircloth until after the study. On this basis we cannot say that plans were definite until Suwannee's fiscal 1974 year, at which point the $75,000 estimated cost of the facility became a reasonable business need. Water Pollution Device
Suwannee was cited for polluting water near its site in 1972 or 1973 and expended approximately $25,000 to correct the problem in either 1973 or 1974. There was not anticipated need to maintain capital for pollution or environmental controls in general, and there is no evidence that Suwannee anticipated any costs relating to any violation until actually cited. The burden of proof is on Suwannee and we cannot determined exactly when the expenditure was made or the citation received. If both occurred in 1973 there was never any accumulation. Thus, we do not believe that Suwannee was required to retain $25,000 to correct a water pollution violation. Self-Insurance Risk
Self-insurance has been accepted as a reasonable need. Central Motor Co. v. United States,supra;Magic Mart, Inc. v. Commissioner,supra, at 794-795. *156 The question here is how much of a reserve did Suwannee maintain and how much would be reasonable, with petitioner contending $100,000 and respondent arguing that there is no evidence in the record from which we can determine the necessary amount of reserve. As to the $25,000 Suwannee was required to deposit with the State of Florida in 1975 because it was unable to obtain a bond, we find no evidence that supports Suwannee's contention that it reasonably anticipated its failure to obtain a bond or that it would be required to deposit the $25,000 during any of its fiscal years in issue. The only evidence supporting the remaining $75,000 was Dickert's estimate that Suwannee's workmen's compensation expense averaged 12 percent of its annual payroll. No other corroborating evidence or testimony was introduced. We are unable based upon the testimony, admittedly only an estimate, to find that Suwannee actually maintained such a large reserve. In fact, the record does not indicate that Suwannee maintained any reserve for self-insurance but instead considered it an annual operating cost. If so, the payouts would have been properly reflected as a current operating expense in our operating *157 cycle computation. While we are aware that if a reserve is established against a continuing hazard and losses are satisfied (out of current operating expenses) as they occur, this alone does not require an abandonment or reduction of the reserve. Smoot Sand & Gravel Corp. v. Commissioner,supra. But here the amount of reserve (if any) was based upon the estimated annual costs and no actual reserve was provided on Suwannee's books. [36] On these facts, we cannot say that Suwannee maintained any reserves for nonrecurring expenses. Reserve for Loss
Petitioner also maintains that it retained a reserve for losses from operations of $150,000 in its 1972 and 1973 fiscal years and of $450,000 in its 1974 fiscal year. Respondent concedes that a reserve for losses is a reasonable business need but contends that Suwannee did not anticipate any losses. See Simons-Eastern Company v. United States,354 F. Supp. 1003 (N.D. Ga. 1972). To the extent that a reserve for losses is allowable, it must be shown at least that losses *158 are reasonably anticipated, and we do not believe petitioner has shown this. For fiscal years 1972 and 1973, as we noted earlier, Suwannee was riding an economic boom in the housing industry. Although in fiscal 1974 there was a downturn in Suwannee's market and a general unprofitable trend in operations (leading to losses in fiscal 1975) we do not believe losses were anticipated. In fact, in view oof Suwannee's purchase of F.F.P. and its planned expansion, Suwannee must have, at most, expected the downturn to be temporary. Even assuming Suwannee expected losses, there is no evidence that Suwannee had any reserves, or if it did, had any plans with respect to the reserves. If the downturn was expected to create needs, they remain unspecified and Suwannee has not shown plans to meet them. On the record we cannot say that Suwannee either anticipated losses or that if it did, it had specific plans for the use of any accumulation. Having determined that Suwannee's available working capital exceeded its operating expenses and reasonable business needs, [37] we must now determine whether petitioner has proven by a preponderance of the evidence that it did not have the proscribed purpose *159 of accumulating earnings to avoid the income tax with respect to its shareholders. In United States v. Donruss Co.,393 U.S. 297 (1969), the Supreme Court held, in determining the applicability of the accumulated earnings tax, that tax avoidance need be only one of the purposes for accumulating earnings, and it need not be the dominant or controlling purpose. [38] *160 Although there are factors that support petitioner's claims (for example, it made no loans or advances to shareholders or payments for their personal use) the evidence clearly weighs to the contrary, especially in view of Suwannee's reasonable business needs in relationship to the amount of the accumulation. There was a steady accumulation of corporate earnings with minimal dividend payouts, investments in unrelated business activities (Applied Management and Entertainment Media), and the retention of earnings to provide against unrealistic hazards. See Kerr-Cochran, Inc. v. Commissioner,253 F.2d 121, 128 (8th Cir. 1958) and section 1.537-2, Income Tax Regs. On reply brief petitioner points to an additional factor which, it contends, shows there was not the proscribed intent. *161 Under the Federal Government's Economic Stabilization Program, dividend control guidelines were issued by the Cost of Living Council and Committee on Interest and Dividends. Although these guidelines applied only to corporations having 500 or more shareholders, section 3.02 of Rev. Proc. 72-11, 1972-1 C.B. 732, provided that where a corporation exempt from the dividend guidelines-- * * * permits its earnings and profits to accumulate for that year beyond the reasonable needs of the business, in order to comply with the spirit of the dividend guidelines, such excess accumulations will not be subject * * * [to] section 531 * * * provided it distributes for that taxable year * * * the maximum amount that could have been paid * * * without exceeding [the guidelines].
Although a relatively small distribution would have brought petitioner within the guidelines, there is nothing in the record by way of testimony or corporate records that supports petitioner's contention that it intended to comply with the guidelines or was even aware of them. Nevertheless, this Court recently held in Estate of Lucas v. Commissioner,supra, that regardless of the taxpayer's intent or proof that it was aware *162 of the guidelines, a taxpayer is entitled to a credit under section 535(c)(1) for reasonable business needs in the amount of accumulations required under the spirit of the guidelines as they existed at the end of each fiscal year. [39] See also Doug-Long Inc. v. Commissioner,supra.[40]
Issue 2. Reasonable Compensation
Whether payments constitute reasonable compensation for services performed and are therefore deductible under section 162(a)(1) is a question of fact to be determined from all the facts and circumstances. Charles Schneider & Co. v. Commissioner,500 F.2d 148 (8th Cir. 1974), affg. T.C. Memo. 1973-130; Pacific Grains, Inc. v. Commissioner,399 F.2d 603 (9th Cir. 1968), affg. T.C. Memo. 1967-7; Levenson & Klein, Inc. v. Commissioner,67 T.C. 694 (1977); *163 Pepsi-Cola Bottling Co. of Salina v. Commissioner,61 T.C. 564 (1974), affd. 528 F.2d 176 (10th Cir. 1975). Where the employee receiving the salary controls the corporation and can determine his own compensation, we must closely scrutinize the arrangement to determine whether the alleged compensation is in fact a distribution of corporate profits. Darco Realty Corporation v. Commissioner,301 F.2d 190, 191 (2d Cir. 1962), affg. T.C. Memo. 1961-110; Levenson & Klein, Inc. v. Commissioner,supra.The burden of showing that the compensation was reasonable is, of course, on petitioner. Rule 142, Tax Court Rules of Practice and Procedure; Botany Worsted Mills v. United States,278 U.S. 282 (1929). In making our analysis we are concerned primarily with: * * * the employee's qualifications; the nature, extent and scope of the employee's work; the size and complexities of the business; a comparison of salaries paid with the gross income and the net income; the prevailing general economic conditions; comparison of salaries with distributions to stockholders; the prevailing rates of compensation for comparable positions in comparable concerns; the salary policy of the taxpayer as to all employees; *164 and in the case of small corporations with a limited number of officers the amount of compensation paid to the particular employee in previous years. Mayson Mfg. Co. v. Commissioner,178 F.2d 115, 119 (6th Cir. 1949), revg. a Memorandum Opinion of this Court. See also Laure v. Commissioner,70 T.C. 1087 (1978); "The Last Ten Years of 'Reasonable' Compensation Cases", CCH Standard Federal Tax Reports, part. 8300, March 7, 1979. We must, therefore, look to the value of the services Foley and Faircloth provided and, to the extent possible, compare their salaries from Suwannee to those paid similarly situated employees. See section 1.162-7(a)(3), Income Tax Regs.
Petitioner relies heavily upon its August 1972 minutes and the resulting study by Foley to support its contention that its salaries were comparable to those paid by similar businesses. Respondent attempts to downplay both the importance and accuracy of the study. Respondent contends that Faircloth had little knowledge of petitioner's business and provided few, if any, services. As to Foley, respondent contends that he performed no services for petitioner during fiscal 1972, and while conceding that Foley performed substantially *165 the same duties for Suwannee in late 1973 and 1974 as he performed as vice president of Anglo-Canadian during 1972 and early 1973, respondent argues that he was paid significantly more by petitioner. Respondent analyzes Foley's income using a theoretical "daily" salary. Foley spent 27 days working on petitioner's affairs during calendar year 1972 and earned $17,500, or $648.15 a day. He spent 182 days working on the affairs of Anglo-Canadian and earned $67,375, or $370.19 a day. Similar computations for 1973 show that Foley's effective daily salary for January-April from Suwannee was $1,111.11 (6 days at $6,666.68) and for May-December from Anglo-Canadian was $200.81 (83 days at $16,667). This argument proves too much, however, because we do not believe that the value of the services rendered by Foley to petitioner is accurately reflected on a daily basis. Providing general information about trends in the West Coast market and new machinery, as well as using personal contacts are not the types of services that would generally be compensated for based upon the number of hours spent actually working. Rather, as would be more appropriate to an advisor-director's salary, compensation *166 would be based upon the value of his information, contacts, and availability to the company. See Smoky Mountains Beverage Co. v. Commissioner,22 T.C. 1249 (1954). The value of services rendered may go far to mitigate their part-time character. Miller Manufacturing Company v. Commissioner,149 F.2d. 421 (4th Cir. 1945). Cf. Henry Schwartz Corp. v. Commissioner,60 T.C. 728, 746 (1973); Perlmutter v. Commissioner,44 T.C. 382 (1965), affd. 373 F.2d 45 (10th Cir. 1967). Much the same can be said about Faircloth. With respect to Faircloth's socializing and public relations work, respondent portrays these activities as related primarily to his International Harvester business. Wile we must consider his salary from petitioner in light of his responsibilities elsewhere, whether Faircloth promoted his own business at the same time he was promoting petitioner's does not negate the value of his services to petitioner, except to the extent that his personal affairs interrupted or interfered with the performance of those services, a circumstance not in evidence here. The fact that performing these services for petitioner may not have created many additional demands on Faircloth does not *167 seem particularly relevant to his value to petitioner. Similarly, we do not see any necessary relationship between the amount of money Faircloth earned through his International Harvester dealership and his salary from petitioner. Assuming (based upon Faircloth's "other income" reported on his income tax return) that he made significantly less from his business than he earned from petitioner, while spending 75 percent of his time occupied with his International Harvester business, absent anything else in the record, we cannot say that a comparison is valid. There could be innumerable reasons to explain the lower earnings, and the business is not sufficiently similar to petitioner's that an analysis of the time spent compared to money earned would be of any apparent value. Having analyzed respondent's objections to the study and finding them without merit, we believe Foley's study provides evidence as to comparable positions and salaries in oither firms. We do not, nonetheless, give it as much weight as petitioner would like since the study is limited in scope. We are aware, of course, that there are factors which support respondent's determination, primary among them being petitioner's *168 history of failure to pay dividends. Charles Schneider & Co. v. Commissioner,500 F.2d 148, 154 (8th Cir. 1974), affg. T.C. Memo. 1973-130, cert. den. 420 U.S. 908 (1975); Pacific Grains, Inc. v. Commissioner,399 F.2d 603, 607 (9th Cir. 1968), affg. T.C. Memo. 1967-7; Miles-Conley Co. v. Commissioner,173 F.2d 958, 960 (4th Cir. 1949), affg. 10 T.C. 754 (1948). Respondent does not deny that the salaries were for the services of experienced, highly qualified men in the industry, but questions only the quantity of services they rendered. Respondent has allowed only $5,000 as reasonable compensation, somewhat less than the amount paid by petitioner for its non-supervisory labor. We have also considered petitioner's profits, increased sales, and salary history. Although the record is somewhat vague as to the actual services and expertise provided, we do not believe the salary payments were unreasonable for the services performed. Petitioner also asserts a claim for attorney's fees under 42 U.S.C. sec. 1988. We have previously held that this provision is inapplicable to Tax Court proceedings. Key Buick Co. v. Commissioner,68 T.C. 178 (1977), on appeal (5th Cir., Aug. 15, 1977). *169 Decision will be entered under Rule 155.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as in effect during the years at issue.↩
2. Respondent based the deficiencies attributable to accumulated earnings tax upon the following amount of accumulated taxable income: Year
Amount
June 30, 1972
$122,967
June 30, 1973
481,053
June 30, 1974
254,211
Respondent did not allow petitioner any credit under section 535(c)(1) for reasonable business needs although credit was allowed for the dividends declared and paid in fiscal 1973 and 1974.
3. Apparently, Forest Sales would contract to sell lumber to various customers and then buy from Suwannee and other manufacturers to fulfill its contracts. Sales made by Suwannee to Forest Sales during the years 1971 through 1974, as set forth below, were at fully competitive prices: ↩
Percentage of Year
Sales Volume
Suwannee's Sales
6/30/71 $ 367,234.02
14.43%
6/30/72
751,054.80
22.80%
6/30/73
1,152,035.82
28.12%
6/30/74
807,000.00
20.66%
*. Includes compensation of officers; salaries and wages (not deducted elsewhere); repairs; bad debts; taxes; interest; contributions; depreciation (less amounts claimed in Cost of Goods Sold and elsewhere); depletion; advertising; pension and profit-sharing plans; employee benefit programs; and other deductions. ↩
4. Inventory on hand during fiscal 1973 (however, a physical inventory was not taken every month): 7/31/73
8/31/73
9/30/73
Pine
$214,426
$234,951
$193,080
Cypress
(4,580)
(5,170)
297
Fuel & Supplies
7,332
7,973
7,937
Total
$217,178
$237,754
$201,314
1/31/74
2/28/74
3/31/74
Pine
$255,251
$279,418
$262,131
Cypress
89,065
94,310
46,207
Fuel & Supplies
10,233
10,829
10,016
Total
$354,549
$384,557
$318,354 10/31/73
11/30/73
12/31/73
Pine
$228,298
$227,133
$275,072
Cypress
30,580
61,106
71,375
Fuel & Supplies
7,269
11,183
10,274
Total
$266,147
$299,422
$356,721
(Estimated)
4/30/74
5/31/74
6/30/74
Pine
$304,732
$314,404
$364,824
Cypress
45,641
44,885
61,161
Fuel & Supplies
7,838
9,078
10,244
Total
$358,211
$368,367
$436,229
We note that the 6/30/74 inventory reflected here is significantly higher than the $386,312 appearing on Suwannee's balance sheet for 6/30/74, but the difference is unexplained. MERCHANDISE BOUGHT FOR
SALARIES AND WAGES YEAR
MANUFACTURE OR SALE
OTHER THAN OFFICERS
December 31, 1962 $ 408,074
$178,593
December 31, 1963
604,482
205,827
December 31, 1964
608,335
249,147
December 31, 1965
701,950
274,976
December 31, 1966
806,795
318,861
December 31, 1967
848,764
356,882
December 31, 1968
995,243
442,424
June 30, 1969 (6 month period)
*
711,717
289,880
June 30, 1970
1,404,225
492,814
June 30, 1971
1,157,500
500,449
June 30, 1972
1,696,180
599,392
June 30, 1973
1,868,330
600,863
June 30, 1974
2,184,529
657,121
June 30, 1975
1,386,414
509,081
↩
OVERHEAD COSTS, INCLUDING
OTHER OPERATING EXPENSES, IN-
AN AMOUNT OF DEPRECIATION
CLUDING AN AMOUNT OF DEPRE- YEAR
SHOWN IN PARENTHESIS
CIATION SHOWN IN PARENTHESIS
December 31, 1962
$154,788 ($23,466)
$ 94,531 ($1,992)
December 31, 1963
146,857 ($14,611)
122,266 ($1,170)
December 31, 1964
201,321 ($25,154)
133,060 ( $ 729)
December 31, 1965
244,384 ($33,384)
135,461 ( $ 951)
December 31, 1966
299,581 ($27,926)
175,782 ($1,217)
December 31, 1967
265,404 ($22,233)
169,095 ($1,168)
December 31, 1968
359,279 ($24,143)
224,056 ($1,648)
June 30, 1969 *
243,355 ($15,176)
152,850 ($1,901)
June 30, 1970
410,926 ($43,078)
287,821 ($4,901)
June 30, 1971
443,503 ($46,199)
305,836 ($4,668)
June 30, 1972
514,417 ($46,839)
375,232 ($5,510)
June 30, 1973
477,765 ($34,782)
440,308 ($5,285)
June 30, 1974
433,481 ($21,003)
479,366 ($4,970)
June 30, 1975
479,697 ($28,422)
334,618 ($2,325)
5. This does not add correctly. Should be $328,430.39 .↩
1. These are the totals stipulated by the parties. The correct figures appear to be $678,345.19; $821,271.37; $1,735,059.25; $1,843,268.61; and $2,337,155.87, respectively.↩
*. $17,500 was reported by Foley on his income tax return as his salary from Suwannee. As noted earlier, in the notice of deficiency, respondent disallowed $10,000 of Foley's salary which was determined to be $15,000. No explanation of the difference was forthcoming.
6. Alma Piston Co. v. Commissioner,T.C. Memo. 1976-107, affd. 579 F.2d 1000 (6th Cir. 1978); Bardahl Manufacturing Corp. v. Commissioner,T.C. Memo. 1965-200↩.
7. See Cadillac Textiles, Inc. v. Commissioner,T.C. Memo. 1975-46; Delaware Trucking Co. v. Commissioner,T.C. Memo. 1973-29; Cheyenne Newspapers, Inc. v. Commissioner,T.C. Memo.1973-52, affd. 494 F.2d 429↩ (10th Cir. 1974).
8. As a third, alternative, petitioner asks us to consider an entire year's operating expenses to reflect its needs. There is nothing in the record to indicate Suwannee needed operating capital equal to one year's operating expenses and we believe use of one operating cycle provides a better gauge of Suwannee's needs.↩
9. Cf. Road Materials, Inc. v. Commissioner,T.C. Memo. 1967-187; Millane Nurseries & Tree Experts, Inc. v. Commissioner,↩ a Memorandum Opinion of this Court dated Dec. 15, 1942.
10. Normally a peak operating cycle is determined by using the figures for inventory and accounts receivable for the one month in which the combined level of the two is at its highest. For cases in which we approved the use of a peak operating cycle for purposes of computing working capital needs, see Magic Mart Inc. v. Commissioner,51 T.C. 775 (1969); Marie's Shop, Inc. v. Commissioner,T.C. Memo. 1977-381; Alma Piston Co. v. Commissioner,T.C. Memo. 1976-107; affd. 579 F.2d 1000 (6th Cir. 1978); Walton Mill, Inc. v. Commissioner,T.C. Memo. 1972-25; Kingsbury Investments, Inc. v. Commissioner,T.C. Memo. 1969-205; Alabama Coca-Cola Bottling Co. v. Commissioner,T.C. Memo. 1969-123; Bardahl International Corp. v. Commissioner, T.C. Memo. 1966-182. For cases in which we approved the use of an average operating cycle for purposes of computing working capital needs see W. L. Mead, Inc. v. Commissioner, T.C. Memo. 1975-215; affd. 551 F.2d 121 (6th Cir. 1977); Mimmac Corp. v. Commissioner,T.C. Memo. 1972-96↩.
11. Of course, if a company raises the price of its items already manufactured before its costs increase, it may receive additional revenues from the sale of these items thus covering its added costs in future operations.The evidence suggests, however, that costs would be passed on by Suwannee only as they were incurred.↩
12. Federal income taxes due at the end of the year are, of course, not included as a current operating expense. Magic Mart, Inc. v. Commissioner,supra, at 794. At least one case refused to consider this as an operating expense although without discussion. James W. Salley, Inc. v. United States, an unreported case at ( W.D.La. 1976, 38↩ AFTR 2d 5076, 76-2 USTC par. 9739).
13. To the extent charitable contributions exceed the 5 percent limitation in section 170(b)(2), they are nonetheless allowed as an adjustment to accumulated taxable income under section 535(b)(2). If contributions to the profit-sharing plan constitute dividends to the shareholders, however, an adjustment may not necessarily be proper in all instances. An adjustment is allowed under section 535(a) for dividends paid during the taxable year as defined in section 561. Section 563(a) permits such dividends to be paid on or before the 15th day of the third month following the close of the taxable year, so such payments would qualify as "paid" even if not actually contributed until after the corporation's taxable year. The problem arises, however, because, pursuant to section 562(c), any distribution that is not pro rata is not entitled to a dividend paid deduction. This same argument could be advanced to disallow an adjustment for unreasonable compensation, at least to the extent the unreasonable compensation is found to be a device to distribute the corporation's earnings and profits. Respondent does not make this argument here, however, and allows a full reduction for the salaries paid M. J. Foley and Faircloth without concern over their reasonableness. We note that disguised dividends, if any, in this case would not be pro rata and would lead to a triple tax on these amounts. Estate of Lucas v. Commissioner,71 T.C. 838 (1979). See Dielectric Materials Corp. v. Commissioner,57 T.C. 597-598 (1972); Cf. Wilson v. Commissioner,10 T.C. 251↩ (1948) (pro rata unreasonable compensation dividend qualified for section 561 deduction but disproportionate "loan" which was found to be a disguised dividend did not). 14. Doug-Long Inc. v. Commissioner,72 T.C. 158 (1979); Kriesel v. Commissioner,T.C. Memo. 1978-50; Alma Piston Co. v. Commissioner,T.C. Memo. 1976-107, affd. 579 F.2d 1000 (6th Cir. 1978); W. L Mead Inc. v. Commissioner, T.C. Momo. 1975-215; Kingsbury Investment Co. v. Commissioner,T.C. Memo. 1969-205; Bardahl International Corp. v. Commissioner,T.C. Memo. 1966-182↩. 15. Apollo Industries Inc. v. Commissioner,358 F.2d 867 (1st Cir. 1966), reversing 44 T.C. 1; Faber Cement Block Co. v. Commissioner,50 T.C. 317, (1968); Bardahl Manufacturing Corp. v. Commissioner;T.C. Memo. 1965-200. See also Schenuit Rubber Company v. United States,293 F. Supp. 280↩ (D.Md. 1968). 16. See also Kriesel v. Commissioner,T.C. Memo. 1978-50; Marie's Shoppe, Inc. v. Commissioner,T.C. Memo. 1977-381; Alma Piston Co. v. Commissioner,T.C. Memo. 1976-107; W. L. Mead, Inc. v. Commissioner,T.C. Memo. 1975-215, affd. 551 F.2d 121 (6th Cir. 1977); Kingsbury Investments Inc. v. Commissioner,T.C. Memo. 1969-205↩.
17. Moreover, as we noted in Bardahl International Corp. v. Commissioner,T.C. Memo. 1966-182, the theory underlying the credit cycle is that an accrual method taxpayer will show an item included in inventory as soon as the obligation to purchase the inventory becomes definite, but, the inventory will not represent an actual cash outlay to the extent payment of the accounts payable with respect to the inventory may be delayed.
18. Kriesel v. Commissioner,T.C. Memo. 1978-50 at fn 11 (car dealerships); W. L. Mead, Inc. v. Commissioner,T.C. Memo. 1975-215, affd. 551 F.2d 121 (6th Cir. 1977) (motor freight business); Kingsbury Investments, Inc. v. Commissioner,T.C. Memo. 1969-205↩, fn 4 (manufacture of machine tools). 19. Marie's Shoppe, Inc. v. Commissioner,T.C. Memo. 1977-381, fn 12; Alma Piston Co. v. Commissioner,supra↩.
20. Respondent uses the figures on the tax returns while petitioner uses its balance sheets. The inventory figures on Suwannee's balance sheet differ from those shown on its income tax returns, except for its fiscal year ending 6/3/71. The difference is apparently attributable to the exclusion from inventory of gas and supplies on the tax return and their inclusion in inventory on the balance sheet. We believe these items properly should be reflected in inventory. Cf. section 1.471-11(c)(2)(i), Income Tax Regs.
21. Petitioner in its calculations uses accounts receivable at year end rather than average receivables. We agree with respondent's use of average receivables during the course of the year as the better indicator of average turnover during the year. The parties again use differing figures in their computations, with respondent using accounts receivable as reflected on Suwannee's income tax returns and petitioner using the amounts reflected on its balance sheet. The reason for the discrepency is unclear and neither party has attempted to explain it. However, it appears that for the 6/30/74 fiscal year, Suwannee incorporated its notes receivable of about $157,839 into accounts receivable on its tax return. Because respondent used the balance sheet to determine current assets and liabilities we believe it would be more consistent to use the accounts receivable (not including income tax refunds) as shown on the balance sheet.↩
22. Petitioner includes this item at a value of $3,277 in all years. ↩
23. On reply brief, petitioner objects to respondent's inclusion of the $37.50 prepaid occupational licenses as a current asset. On original brief, however, petitioner included this item in its computation of current assets as a prepaid expense. In any event, we believe these prepaid taxes would be considered a current asset.↩
24. As shown on petitioner's brief. Petitioner's figures are slightly different than the computations above would indicate because of rounding differences.↩
25. Bardahl Manufacturing Corp. v. Commissioner,T.C. Memo. 1965-200↩.
26. See also Novelart Manufacturing Co. v. Commissioner,52 T.C. 794 (1969), affd. 434 F.2d 1011 (6th Cir. 1970), cert. denied 403 U.S. 918 (1971); Wean Engineering Company v. Commissioner,↩ a Memorandum Opinion of this Court dated July 24, 1943.
27. At least this is so for the year in which nonliquid assets are acquired.↩
28. In Faber Cement Block Co. v. Commissioner,supra, at 330, such amounts were included as a current asset but we did not need to discuss the question because we found for the taxpayer regardless of our resolution.
29. See also Bardahl Manufacturing Co. v. Commissioner,T.C. Memo. 1965-200↩.
30. See Empire Steel Castings, Inc. v. Commissioner,T.C. Memo. 1974-34↩.
31. Suwannee does not contend that it needed any funds for the actual acquisition of F.F.&M., since the merger was accomplished through a stock exchange.↩
32. 3/31/73
3/31/74
Needs for operating cycle
$458,723
$700,001
Excess of current assets
16,253
148,266 Petitioner appears to have made a mathematical error in his addition of current assets. *↩
over current liabilities
33. ↩
3/73
3/74
(1) Average Inventory
$191,100
$324,725
(2) GOGS and other relevant operating
2,078,010
4,311,336
costs (less depreciation)
(3) Inventory Cycle in Days
25.75
27.50
(4) Avg. Accounts Receivables
365,377
546,341
(5) Net Sales
3,414,985
5,672,476
(6) Accounts Receivable Cycle
in Days
39.07
35.16
(7) Average Accounts Payable
417,467
545,071
(8) Materials Purchased
2,881,791
4,558,878
(9) Credit Cycle in days
52.89
43.66
(10) Total Operating Cycle
11.93
19.0
(11) Operating Cycle as % of Year
.033
.052
(12) Current Operating Needs
89,364
224,189
34. ↩
3/31/73
3/31/74
Current Assets
762,106
1,155,012
Current Liabilities
590,379
1,021,171
Excess
171,727
133,841
35. In view of Suwannee's claimed deficit in working capital and alleged large needs of cash for timber, we find it somewhat anomalous that it would acquire a corporation which was in need of as much working capital as it clams F.F.P. needed for expansion. This leads us to suspect that some of Suwannee's claimed needs are either hindsight or inflated.↩
36. The absence of a reserve on its books does not necessarily preclude a finding that a reserve was established. Wilcox Manufacturing Co. v. Commissioner,T.C. Memo. 1979-92↩.
37. ↩
1972
1973
1974
Available Working Capital
$379,027
$796,610
$1,339,201
Needs
Current Operating Needs
$243,963
$324,524 $ 433,390
Profit Sharing
33,364
38,077
46,312
Charitable
635
1,010
590
F.F.P.
200,000
Office building & Retail Store
50,000
50,000
125,000
Fence Post Production
100,000
$327,962
$413,611
905,292
38. We take cognizance of the fact that Suwannee's shareholders would pay a higher tax on the earnings if they were distributed than the amount of penalty imposed by section 531 (because the penalty imposed by section 531 is at a lower rate than a marginal tax rates which would be imposed upon the shareholders upon distribution). While we believe this is evidence that the proscribed purpose existed, it certainly does not prove it. Cummins Diesel Sales of Oregon, Inc. v. United States,207 F. Supp 746 (D. Ore. 1962), affd. 321 F.2d 503 (9th Cir. 1963). See also Commissioner v. Young Motor Company,316 F.2d 267 (1st Cir. 1963), revg. 32 T.C. 1336 (1959); R. Gsell & Co., v. Commissioner,294 F.2d 321 (2d Cir. 1961), revg. 34 T.C. 41 (1960); Estate of Lucas v. Commissioner,supra;Apollo Industries, Inc. v. Commissioner,44 T.C. 1 (1965), revd. on other grounds, 358 F.2d 867 (1st Cir. 1966). We note also that Dickert was aware of the section 531 tax.Cf. C.E. Hooper, Inc. v. United States,supra;Simons-Eastern Company v. United States,354 F. Supp. 1003 (N.D. Ga. 1972↩).
39. As to fiscal 1974, Rev. Proc. 73-33, 1973-2 C.B. 489 withdrew of the benefit of Rev. Proc. 72-11 for corporations not subject to the guidelines for taxable years ending after December 31, 1973. See also Rev. Proc. 72-42, 1972-2 C.B. 823, Rev. Proc. 74-7, 1974-1 C.B. 419↩. 40. Order reasonable business needs allowed as a credit under section 535(c) are subsumed within, and are not in addition to the amount of the credit allowed as a reasonable need under the dividend guidelines.↩